**Gene KNIPE, Plaintiff-Appellant,**

v.

**Margaret M. HECKLER, Secretary, Department of Health and Human Services, Defendant-Appellee.**

**No. 84–1179.**

United States Court of Appeals, Tenth Circuit.

Feb. 13, 1985.

John G. Heike of Weisbrod & Weisbrod, Dallas, Tex., for plaintiff-appellant.

Mary K. Biester, Asst. Regional Atty., Dept. of Health and Human Services, Dallas, Tex. (Gary L. Richardson, U.S. Atty., Ralph F. Keen, Asst. U.S. Atty., Muskogee, Okl., Gayla Fuller, Acting Regional Atty., Dept. of Health and Human Services, Washington, D.C., were also on the brief), for defendant-appellee.

Before HOLLOWAY, Chief Judge, and DOYLE and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

Gene Knipe appeals from the denial of Social Security disability insurance benefits and supplemental security income benefits. I R. 2. On August 7, 1981, Mr. Knipe filed an application for benefits alleging that he was "disabled because of back problems, heart trouble, high blood pressure and diabetes." I R. 74; *see also* II R. 73–76. At the administrative level, the Secretary of Health and Human Services (Secretary) determined that Mr. Knipe was not disabled under the Social Security Act and denied Mr. Knipe's request for benefits. II R. 97–111. On May 28, 1982, after a hearing, the Administrative Law Judge (ALJ) denied benefits, II R. 22, 34, and on February 7, 1983, the Appeals Council denied Mr. Knipe's request for review. II R. 4.

On March 25, 1983, Mr. Knipe brought an action in district court for review of the administrative decision. I R. 1. The district court denied Mr. Knipe's motion for summary judgment, affirmed the ALJ's decision, and entered judgment for the Secretary. I R. 78. Mr. Knipe appeals.

## I

### A. Facts

At the time of the ALJ's decision, Knipe was forty-five. II R. 32–33. He had a high school education. He had worked as a police officer for a number of years, a security guard, and then as a driver/salesman. He left his job as a salesman after his second job-related back injury.

Knipe sought benefits alleging that he had essentially four impairments. First, he complained of his bad back and the pain related to it. His back injuries had required his hospitalization on at least two occasions. In February 1980, X-rays showed significant narrowing of the intervertebral disc at the lumbrosacral junction, indicating probable disc degeneration or herniation. Brief for Appellee 3. Surgery was not performed because Mr. Knipe was a diabetic with high blood pressure and extensive heart disease. Because of these other health problems, one physician commented that "[n]o neurosurgeon in his right mind will operate on this patient." II R. 273. He was given conservative treatment including local heat, massage, II R. 153, traction and exercise, the latter two to be continued at home. II R. 189. This treatment did provide him with some relief from the pain. II R. 296, 298.

Second, Mr. Knipe suffered from adult onset diabetes mellitus. II R. 259.[1] He takes insulin for this condition. II R. 284. He has "had trouble controlling [his] diabetic problem of 11 years in duration with apparently a so-called brittle type of diabetes," II R. 194, which "necessitates the patient's having hospitalization for management at intervals." II R. 189. He has been in a diabetic coma on two occasions. II R. 146.

1. Diabetes mellitus is "characterized by abnormal insulin secretion and a variety of metabolic and vascular manifestations reflected in a tendency toward inappropriately elevated blood glucose levels, accelerated nonspecific atherosclerosis, neuropathy, and thickened capillary basal lamina causing renal and retinal impairment." *The Merck Manual* 1037 (14th ed. 1982).

Third, Mr. Knipe suffered from high blood pressure. This condition has necessitated that he take medication. *See* II R. 189.[2]

Fourth, he suffers from severe heart disease, having had four heart attacks in the previous three years before the hearing. II R. 26, 57, 284. He has severe left ventricular dysfunction with an ejection fraction of only 22%,[3] II R. 265, and severe diffuse three vessel coronary artery disease. II R. 265. His left anterior descending artery was totally occluded at the level of the first diagonal branch; one circumflex marginal branch had an 80% proximal stenosis and the right coronary artery was a small vessel with a 90% mid lesion. II R. 265. Prior to the hearing before the ALJ, the agency reports on two occasions stated the diagnosis that Knipe had arteriosclerotic heart disease. II R. 101, 103.[4] After the hearing the ALJ found that Knipe suffered from ischemic heart disease.[5]

Knipe also complained of troubles with his legs which may be attributable to the above health problems. *See* II R. 134. He had numbness in his left great toe and adjacent areas. II R. 153; *see also* II R. 63–54, 275. Knipe testified that when he stands for several hours his legs become swollen. II R. 63–64; *see also* II R. 134.

There is also atrophy of his intrinsic foot muscles. II R. 153.

Further compounding the above health problems is Mr. Knipe's mental impairment which he alleges is attributable to brain damage from one of his heart attacks. II R. 13. Although it is unclear whether Knipe explicitly asserted that this was a separate impairment before the ALJ, the ALJ did refer to a psychological evaluation of Mr. Knipe. II R. 28. This evaluation stated that "with regard to [Mr. Knipe's] neuropsychological status, test data (the Hain scored Bender Gestalt) is indicative of organic impairment. The difficulty which Mr. Knipe seems to experience in putting both conceptual and concrete things together ... could well be a reflector of this type impairment." II R. 285. The evaluation also found that Knipe had a verbal I.Q. of 82, a performance I.Q. of 76, and a full scale I.Q. of 78. II R. 285. He had an eighth grade reading level, a sixth grade spelling level, and a third grade arithmetic level. *Id.*[6] The evaluation did find that Knipe was "socially sensitive" and that his strengths were his "common sense" and his "facility with the English language." However, his "[w]eaknesses were apparent in his ability to think and reason abstractly as well as his visual-motor coordination in

2. The record reveals that Mr. Knipe's blood pressure ranged from 178/105, II R. 207, to 120/80. II R. 262; *see also* II R. 191 (160/100); II R. 212 (140/90); II R. 260 (130/90); II R. 275 (160/100); II R. 277 (165/105); II R. 281 (175/90); II R. 306 (120/82). During a 15-Lead EKG Maximal Exercise Test at St. Paul Hospital on January 22, 1981, Mr. Knipe's blood pressure at rest was 110/80, and during exercise it was 140/80. II R. 266.

3. An ejection fraction is "the ratio of left ventricular stroke volume (SV) to end-diastolic volume (EDV)." J. Hurst, *The Heart Arteries and Veins* 89 (5th ed. 1982). An ejection fraction averages $0.67 \pm 0.08$ in normal subjects. 1 *Heart Disease: A Textbook of Cardiovascular Medicine* 474 (2d ed. 1984).

4. Coronary arteriosclerosis "is a nonspecific term that includes several conditions producing hardening of the coronary arteries." E. Chung, *Quick Reference to Cardiovascular Diseases* 158 (2d ed. 1980). It "is a generic term for a number of blood vessel diseases, atherosclerosis be-

ing the most important." *The Merck Manual* 386 (14th ed. 1982).

"The basic pathophysiology of atherosclerotic coronary heart disease is an imbalance between myocardial oxygen supply and demand. Oxygen supply may decrease or demand may increase beyond the limits of coronary perfusion reserve, resulting in ischemia." E. Chung, *supra,* at 159.

5. Myocardial ischemia is a "deficiency of blood supply to the heart muscle, due to obstruction or constriction of the coronary arteries." *Dorland's Illustrated Medical Dictionary* 799 (25th ed. 1974).

6. To be more precise, his reading, spelling and arithmetic grade levels were as follows:

| | | |
|---|---|---|
| Reading | Grade level | 8.4 |
| Spelling | Grade level | 6.7 |
| Arithmetic | Grade level | 3.6 |

II R. 285.

both familiar and unfamiliar settings. He has difficulty putting concrete things together with his hands as well as generalizing from his knowledge of concepts." II R. 285.

With this brief summary of Mr. Knipe's impairments as our backdrop, we now turn to the decisions of the ALJ, the Appeals Council, and the district court.

## B. The rulings below

The ALJ stated that the issues were whether Knipe "is entitled to a period of disability and to disability insurance benefits under Sections 216(i) and 223 respectively of the Social Security Act; and whether the claimant is disabled under Section 1614(a)(3) of the Social Security Act." II R. 22. The ALJ found that the claimant had "the following impairments: ischemic heart disease, controlled diabetes mellitus, controlled herniated intervertebral disc, L4, right, treated conservatively." II R. 32.

In concluding that Knipe was not disabled, the ALJ first reasoned that the pre- \ponderance of the medical evidence demonstrated that Knipe did not suffer from an impairment equal to any impairment in the Listing of Impairments. II R. 31. *See* Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (1982) (Listing of Impairments). He reached this conclusion apparently believing that neither the claimant's diabetes, heart disease, nor back troubles met the Listing of Impairments. The ALJ concluded that although the claimant suffered from a combination of impairments which would prevent him from performing his past occupations of patrolman or security guard, which was work requiring a medium level of exertion, these impairments would not prevent him from engaging in light work on a sustained basis. II R. 31. Finally the ALJ explained that Knipe is 45 years old and under Regulations 404.1563 and 416.963 he is a younger individual. Under Regulations 404.1564 and 416.964,

he has a high school education and above, and he has performed primarily skilled work. Given this, Rule 202.21 of the Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (1982) (the grids), directs that Mr. Knipe be found not disabled. II R. 32. The Appeals Council concluded that there was no basis under the regulations for granting Knipe's request for review of the ALJ's decision.

The district court affirmed and entered summary judgment for defendant. The court reasoned that the finding of the Secretary and the inferences based on those findings cannot be disturbed if supported by substantial evidence. I R. 75; *see* 42 U.S.C. § 405(g). The court said that the record reflected that Knipe had a twelfth grade education with work experience as a truck driver, salesman, security guard, and sheriff's deputy; that he had testified that his daily activities consisted of limited lawn mowing and sitting around his mother's house; and that Knipe stated he could walk two or three blocks and drive an automobile short distances. I R. 77. The court concluded that the decision was supported by substantial evidence and that the "evidence clearly reflect[ed]" that Knipe had a residual functual capacity to do light work. I R. 77, 78.[7]

## II

## Disability under the Listing of Impairments

Mr. Knipe applied for disability insurance benefits, 42 U.S.C. § 423(a)(1), and supplemental security income benefits. 42 U.S.C. § 1382(a)(1). Under each, a claimant must be disabled to qualify for benefits. *See, e.g.,* 42 U.S.C. §§ 423(a)(1), 1382(a)(1). Our scope of review of a disability award determination is restricted. We must uphold the decision if it is supported by substantial

7. In passing we note that Knipe had serious health problems when he first injured his back. After treatment he returned to work and reinjured his back. It was at this point that he brought this claim for disability benefits. One medical report noted that Knipe "really seems to be hardworking and sincere." II R. 137. In his psychological evaluation, it was reported that he is "a man who is fairly well motivated to get a job in order to take care of himself." II R. 286.

evidence. *See* 42 U.S.C. § 405(g); *Tillery v. Schweiker*, 713 F.2d 601, 603 (10th Cir. 1983); *see also Bowen v. Heckler*, 748 F.2d 629, 634 (11th Cir.1984).

Substantial evidence is "defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' It must be 'more than a mere scintilla.'" *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir.1983) (per curiam) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). This oft-cited language is not a talismanic formula for adjudication; the determination is not merely a quantitative exercise. Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians) or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983).

The ALJ and the appeals council held that Mr. Knipe was not disabled and accordingly denied all benefits. We conclude that the agency findings are not supported by substantial evidence and reverse. From our detailed review of the record, we must hold that Knipe's ischemic heart disease, his chest pain, and his severely deficient ejection fraction of 22% meet the requirements of § 4.04(D) of the Listing of Impairments, and he is therefore per se disabled.[8]

Sections 423(d)(1) and 1382c(a)(3)(A), 42 U.S.C., define a disabled individual as one who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Under these sections a claimant is determined to be "under

a disability only if" his physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in "any other kind of substantial gainful work" existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

██ Mr. Knipe argues, among other things, that if a claimant has an impairment contained in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1 (1982) (Listing of Impairments), it warrants a conclusive finding of disability without consideration of any other factors. Brief of Appellant 18. Knipe says that because his ejection fraction is below the level of severity in the Listing of Impairments, he should have been found to be disabled. The Secretary merely makes a general response that "none of appellant's impairments meet or exceed the Listing of Impairments." Brief of Appellee 28. We are convinced that Mr. Knipe's heart impairments do meet § 4.04(D) of the Listing of Impairments. We, therefore, hold that the findings that he is not disabled are not supported by substantial evidence and that he is disabled within the meaning of the Act.

██ The Regulations provide that if the severity of a claimant's impairment meets or exceeds that found in the Listing of Impairments, he will be found "disabled without considering [his] age, education, and work experience." 20 C.F.R. § 404.-1520(d) (1982). The Regulations describe the disabilities in the Listing of Impairments as "impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1525(a) (1982). As the Su-

---

**8.** In determining whether an individual is disabled, "the relevant law and regulations governing a claim for disability benefits are identical to those governing a claim for supplemental income benefits, [and] we treat the two claims together." *Davis v. Heckler*, 748 F.2d 293, 294 n. 2 (5th Cir.1984); *see also Rivers v. Schweiker*, 684 F.2d 1144, 1146 n. 1 (5th Cir.1982); *compare* 20 C.F.R. §§ 404.1520–404.1525 (1984) *with*

20 C.F.R. §§ 416.920–416.925 (1984). Although the law regarding when an individual is disabled is virtually identical for disability insurance benefits and supplemental income benefits, other eligibility requirements do differ. Accordingly, in Part III of this opinion we separately discuss Mr. Knipe's entitlement to disability insurance benefits and supplemental income benefits.

preme Court noted, "[t]he regulations recognize that certain impairments are so severe that they prevent a person from pursuing any gainful work." *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). When a claimant's disability is equal to or more severe than an impairment in the Listing of Impairments, he is per se disabled. *See, e.g., Chico v. Schweiker,* 710 F.2d 947, 951 (2d Cir.1983); *Jackson v. Schweiker,* 696 F.2d 630, 632–33 (8th Cir.1983); *see also Davis v. Heckler,* 748 F.2d 293, 294 n. 4 (5th Cir.1984); *Tillery v. Schweiker,* 713 F.2d 601, 602 (10th Cir.1983).[9]

Section 4.00 of the Listing of Impairments deals with impairments of the cardiovascular system. Under § 4.04 and § 4.04(D), a claimant is disabled if he has "[i]schemic heart disease with chest pain of cardiac origin as described in 4.00E. With ... Left ventricular ejection fraction of 30 percent or less measured at cardiac catheterization or by echocardiography." The ALJ found that Mr. Knipe suffers from ischemic heart disease, II R. 32, and the evidence is uncontroverted that Mr. Knipe's left ventricular ejection fraction at cardiac catheterization is below 30 percent. *See* II R. 261 (25%); II R. 264 (22%); II R. 265 (22%).

Given that Mr. Knipe has ischemic heart disease with an ejection fraction below 30 percent, he is per se disabled if he also has chest pain of cardiac origin under § 4.00E ("pain which is precipitated by effort and promptly relieved by sublinguinal nitroglycerin or rapid acting nitrates or rest"). It appears the ALJ believed that Mr. Knipe did not have chest pain of cardiac origin and therefore did not have ischemic heart disease of such severity to equal an impairment in the Listing of Impairments.[10] On

appeal the Secretary appears to argue that Mr. Knipe's ischemic heart disease does not meet § 4.04(D) of the Listing of Impairments because "he does not suffer chest pain." Brief of Appellee 28. We cannot agree that substantial evidence exists to support a finding that Mr. Knipe did not suffer from chest pain of cardiac origin under § 4.00E.

To conclude that Mr. Knipe did not have chest pain of cardiac origin, it appears that the ALJ relied on three physicians' reports. The first reported that Mr. Knipe had no chest pain during a stress test in which he stopped with fatigue. II R. 261, 266. The second was a report of Dr. Kearns in which he said that Mr. Knipe "did have chest pain in the hospital which I believe was musculoskeletal rather than anginal type pain." II R. 267. The third was a report of Dr. Barnes in which he said that "[a]t the present time, [Knipe] has no significant dyspnea on exertion nor any chest pain." II R. 305.[11] Considering these reports and the record as a whole, however, there is not substantial evidence to support a finding that Mr. Knipe does not have chest pain of cardiac origin as defined in § 4.00E.

■ Section 4.00E defines chest pain of cardiac origin as:

pain which is precipitated by effort and promptly relieved by sublingual nitroglycerin or rapid acting nitrates or rest. The character of the pain is classically described as crushing, squeezing, burning, or oppressive pain located in the chest.

To establish that chest pain of cardiac origin is present, the pain need not occur during a stress test, *see Jackson v. Schweiker,* 696 F.2d 630, 632 (8th Cir.1983); nor must it occur at any threshold level of

---

**9.** The Secretary agrees that this is the law. *See* Brief of Appellee 26 (If an impairment equals an impairment listed in Appendix 1, "disability is automatic").

**10.** The ALJ stated that "[i]schemic heart disease may result in a severe impairment due to chest pain. At the present time, the claimant has no significant dyspnea on exertion nor any chest pain." II R. 31; *see also id.* at 28. Prior to the

hearing before the ALJ, the Secretary also concluded that Knipe did not have chest pain. II R. 102, 104.

**11.** The ALJ did not refer to any of these reports. Our careful search of the record has uncovered no other evidence on which the ALJ might have relied in reaching his conclusion that Knipe does not have chest pain of cardiac origin.

frequency or duration. *See Blumberg v. Heckler*, 598 F.Supp. 1250, 1261 (S.D.Fla. 1984). For example in *Jackson* the claimant had ischemic heart disease. The results of her stress test demonstrated that her heart was sufficiently impaired under § 4.04(A)(1) of the Listing of Impairments so that she would be disabled if she also experienced chest pain of cardiac origin. In concluding that such chest pain was not present, the ALJ apparently relied upon a doctor's statement that the claimant had no chest pain during the stress test. *Jackson*, 696 F.2d at 631–32. The Eighth Circuit reversed, concluding that although the absence of pain during a stress test could be an important factor, it was not determinitive "because of the undisputed evidence elsewhere in the record that [the claimant] experienced frequent chest pain." *Id.* at 632.

Similarly, in *Blumberg v. Heckler*, 598 F.Supp. 1250 (S.D.Fla.1984), a claimant had sufficiently severe ischemic heart disease so that he would be automatically disabled under § 4.04(A)(1) if he also had chest pain of cardiac origin. The ALJ had denied benefits. He had found that the claimant's "allegations of constant or severe chest pains are clearly not supported by the evidence of record, the claimant's own testimony or the Administrative Law Judge's observation at the hearing, and are not credible to the degree alleged." *Id.* at 1255–56. The court relied on numerous medical reports that the claimant had chest pain of cardiac origin, and concluded that the ALJ's decision was not supported by substantial evidence.

To support its conclusion, *Blumberg* noted that Section 4.00D of the Listing of Impairments indicates that a claimant has ischemic heart disease if he experiences chest pain of cardiac origin and there is objective medical evidence, such as a positive treadmill test, which supports the clinical impression of chest pain. "It *does not require* the chest pain of cardiac origin to occur at *any* designated *minimal level of frequency* or duration. . . . Rather in order to support an automatic finding of disability according to the literal, textual language of § 4.04(A)(1), an individual must merely demonstrate an objective test consistent with the requirements, and experience chest pain of cardiac origin." *Blumberg*, 598 F.Supp. at 1261 (emphasis added).

■ Mr. Knipe satisfied the requirements to support an automatic finding of disability. He has submitted an objective test consistent with the requirements of § 4.04(D), and he has chest pain of cardiac origin.[12] First, his low 22% ejection fraction measured at cardiac catheterization is undeniably low enough to meet the requirements of § 4.04(D). Second, there is undisputed record evidence that Knipe has experienced chest pain of cardiac origin, and, of course, the ALJ found that he had ischemic heart disease.

With respect to chest pain, in April 1980 Dr. Zisman reported that Mr. Knipe had chest pain while doing the Williams exercises for his back. The report also noted that he had been hospitalized five to six years earlier with acute chest pain and was diagnosed as having a myocardial infarction.

---

12. The regulations regarding the Listing of Impairments also require that the evidence "show that the impairment has lasted or is expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1525(a). Although the Secretary has not argued that Mr. Knipe does not meet the durational requirement, we nevertheless point out that he does.

Section 404.1525(a), 20 C.F.R., states that "[m]ost of the listed impairments are permanent or expected to result in death, or a specific statement of duration is made." There is no specific statement of duration pertaining to ischemic heart disease. Furthermore, there is evidence in the record that indicates that Mr.

Knipe's condition has lasted or is expected to last for a continuous twelve month period. In April of 1980, Mr. Knipe had chest pain while doing Dr. Paul Williams' exercises for his back. II R. 146. In August 1981, Mr. Knipe was described as having "only minimal chest pain," in connection with his "congestive failure, left ventricular decompensation." II R. 297. In May 1982 Mr. Knipe testified before the ALJ that he had chest pain, II R. 64–67, and that his condition is worsening. II R. 66. All of the above taken together is more than enough to conclude that Mr. Knipe's impairment has lasted or is expected to last for a continuous period of twelve months.

II R. 146. In March 1981, after Knipe was hospitalized with congestive heart failure, Dr. Rothkopf reported that Mr. Knipe had "intermittent chest pressure from time to time which may be anginal and possibly musculoskeletal." II R. 262. Dr. Aebersold in a report of August 1981 described Mr. Knipe's second episode in two weeks of "congestive failure, left ventricular decompensation." Although in describing the episode Dr. Aebersold reported that Mr. Knipe had "only minimal pain," the doctor did recognize that he experienced chest pain. II R. 297.

Mr. Knipe testified that he had chest pain on exertion. The ALJ did not find that Mr. Knipe's testimony on this point was not credible; rather the ALJ never discussed this testimony. In response to questioning from his attorney, Mr. Knipe related that "[e]very once in a while, whenever I over-exert myself or something like that you know, I'll have some chest pains." II R. 64. If Mr. Knipe "tr[ies] to do exercise or mow the lawn" he has "heart pain." II R. 66–67. He also testified that his condition, including his other impairments, is worsening. II R. 66.[13]

In addition, it is undisputed that Mr. Knipe takes nitro-bid for his heart pain. II R. 58, 64–65, 134. In fact, the ALJ noted in his opinion that during an 11-day hospitalization in February 1982 for low back and knee pain, an electrocardiogram showed tachycardia and an apparent previous anterior myocardial infarction and

Knipe was "continued on Nitrobid and Lasix, 40 mg. daily." II R. 29. Nitro-bid is a brand name for nitroglycerin. *See* J. Long, *The Essential Guide to Prescription Drugs* 460 (rev. ed. 1980). Nitroglycerin is one of the drugs which § 4.00E of the Listing of Impairments describes as "promptly reliev[ing]" chest pain of cardiac origin. *See* Listing of Impairments § 4.00E (chest pain of cardiac origin promptly relieved by "sublingual nitroglycerin or rapid-acting nitrates or rest"). Mr. Knipe's uncontradicted testimony establishes that he takes an extra nitrobid when he has chest pains. II R. 64–65. This further dictates the conclusion that Mr. Knipe has chest pain of cardiac origin.[14] *See Blumberg*, 598 F.Supp. at 1260 (court notes that claimant takes a prescribed nitrate and that nitrates are one of relief-causing agents under § 4.00E for chest pain of cardiac origin).[15]

It is not questioned that Mr. Knipe's ejection fraction measured at catheterization (22%) is well below 30 percent as required by § 4.04(D). Moreover, the only conclusion that can be drawn from the evidence is that he has ischemic heart disease, and he has had chest pain of cardiac origin under § 4.00E. Accordingly we hold that Mr. Knipe is per se disabled under § 4.04(D) of the Listing of Impairments and that the findings adverse to him on

---

**13.** In his opinion, the ALJ said that he did "not find fully credible" Knipe's testimony on the severity of his headaches and back, right leg and knee pain. II R. 30. Again the ALJ's opinion found that the claimant's "allegation of headaches and constant, severe back, right leg and right knee pain is not credible and such pain does not restrict his physical activity to perform light work." II R. 33. However, the ALJ made *no* finding against Knipe with respect to his credibility in testifying as to his chest pain.

**14.** We note that the intended therapeutic effect of nitroglycerin is "[r]eduction in the frequency and severity of pain associated with angina pectoris (coronary insufficiency)." J. Long, *The Essential Guide to Prescription Drugs* 460 (rev. ed. 1980).

**15.** None of the physicians' reports on which the ALJ may have relied to conclude that Knipe did not have chest pain stated that he never had such pain. All three make reference to the absence of pain at a particular point in time. *See* II R. 261, 266 (no chest pain during stress test); II R. 267 (chest pain in hospital which was probably musculoskeletal rather than anginal); II R. 305 ("At the present time" no chest pain). We have held today that § 4.04 of the Listing of Impairments does not require chest pain at any threshold level of frequency or duration. In view of this holding and the uncontroverted record evidence that Knipe does experience chest pain of cardiac origin, these doctors reports, referring only to an absence of such pain at a particular point in time, cannot constitute substantial evidence to support the ALJ's conclusion.

disability are clearly not supported by substantial evidence and must be reversed.[16]

## III

### Conclusion

Mr. Knipe applied for disability insurance benefits, 42 U.S.C. § 423(a)(1), and supplemental security income benefits, 42 U.S.C. § 1382(a)(1). Under § 423(a)(1) an individual is entitled to disability insurance benefits if he is so insured; he has not attained retirement age; he has filed an application for such benefits; and he is under a disability. We have held that Knipe is disabled, and there is no dispute that he meets the other requirements to be entitled to social security disability insurance benefits.[17] Therefore, we hold that Knipe was entitled to disability insurance benefits, 42 U.S.C. § 423, as of May 1, 1981, the date he alleged that he became disabled.

As to eligibility for supplemental security income, 42 U.S.C. § 1382(a)(1) defines an eligible individual as an "aged, blind or disabled individual who does not have an eligible spouse and" whose income and resources are below a specified level. Although we can say that Mr. Knipe is disabled under § 1382(a)(1), and the record does indicate that he has no income, II R. 26, we are unable to determine from the record if he also has resources as defined by the Act below the statutory limit. We

must remand to the Secretary to determine if Knipe's resources and income are below the statutory maximum. We hold that if the Secretary determines that Knipe's resources and income do not exceed the limit, he was eligible for supplemental security income benefits as of May 1, 1981.

Accordingly, the judgment is reversed. The case is remanded to the Secretary for prompt payment to Knipe of social security disability insurance benefits from May 1, 1981, to the present and future payments to which he is entitled. Without delaying such disability payments, the Secretary shall also make a prompt determination whether Knipe had resources below the statutory limit so as to qualify him for supplemental social security benefits, and if he was so qualified, for prompt payment thereof.[18]

**16.** The Secretary argues that Knipe's problems can be attributed to his failure to take his medication and to his smoking. The Secretary reasons that where a claimant has wilfully failed to take his prescribed medication, he will not be found disabled, *see* 20 C.F.R. §§ 404.1530, 416.930 (1984), and that when a claimant fails to stop smoking, it militates against a finding of disability. *See* Brief For Appellee 19–22.

We reject the Secretary's argument. First, neither the ALJ, nor the Appeals Council cited this as a reason for denying benefits to Knipe, and we therefore should not uphold the agency's denial of benefits on this basis. *See, e.g., Dong Sik Kwon v. INS,* 646 F.2d 909, 916 (5th Cir.1981) (en banc) (in reviewing order of Board of Immigration Appeals, court is not permitted to consider reasons not advanced by Board); *Mercantile Texas Corp. v. Board of Governors of the Federal Reserve System,* 638 F.2d 1255, 1260 (5th Cir.1981), (decision cannot be affirmed on basis of appellate counsel's *post hoc* rationalizations for agency action). Second,

there is evidence in the record indicating that Knipe stopped taking his medications because he lacked the financial resources to purchase them. *See* II R. 63, 273, 278. Third, there is evidence that Knipe has significantly cut back his smoking as a result of medical advice. II R. 281.

**17.** The ALJ noted that Knipe was "fully insured" on May 1, 1981, the alleged onset date, and continues to meet the work requirements for disability purposes at least through September 30, 1986. II R. 30; II R. 32. Knipe's forty-five years are below retirement age. *See* 42 U.S.C. §§ 423(a)(1)(B), 416(*l*). Knipe also filed an application for benefits. II R. 22.

**18.** A remand directly to the Secretary for such relief is appropriate. *See Dorsey v. Heckler,* 702 F.2d 597, 609 (5th Cir.1983); *Broadbent v. Harris,* 698 F.2d 407, 414 (10th Cir.1983) (per curiam); 28 U.S.C. § 2106.