Sharon S. SANDY, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.

No. 87–4133.

United States District Court, D. Kansas.

Nov. 13, 1989.

Robert B. Wareheim, McCullough, Wareheim & LaBunker, Topeka, Kan., for plaintiff.

Leon J. Patton, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action to review a final decision by the Secretary of Health and Human Services regarding plaintiff's entitlement to supplemental security income benefits under the Social Security Act. This matter is presently before the court upon defendant's motion for an order affirming the Secretary's decision. Having carefully reviewed the record, the court is now prepared to rule.

Plaintiff filed an application for supplemental security income benefits on August 28, 1985. Plaintiff indicated on the application that she was disabled due to "back and disc injury." The disability was alleged to have begun in November, 1982. The application was denied initially and on reconsideration by the Social Security Administration. At plaintiff's request, a hearing before an administrative law judge (ALJ) was held on June 19, 1986. On November 14, 1986, the ALJ found that plaintiff was not disabled and thus not entitled to supplemental security income benefits. On February 13, 1987, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Secretary.

The legal standards applicable in this case were recently set forth in *Gossett v. Bowen*, 862 F.2d 802, 804–05 (10th Cir. 1988) as follows:

Under the Social Security Act the claimant bears the burden of proving a disability, as defined by the Act, which prevents him from engaging in his prior work activity. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988); 42 U.S.C.A.

§ 423(d)(5) (1983). Once the claimant has established such a disability, the burden shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Reyes*, 845 F.2d at 243; *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988); *Harris v. Secretary of Health and Human Services*, 821 F.2d 541, 544–45 (10th Cir.1987). The Secretary meets this burden if the decision is supported by substantial evidence. *See Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir.1987); *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir.1986). "Substantial evidence" requires "more than a scintilla, but less than a preponderance," and is satisfied by such relevant "evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d at 1521; *Brown*, 801 F.2d at 362. The determination of whether substantial evidence supports the Secretary's decision, however,

> "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.'"

*Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir.1985) (quoting *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985)).

The record in this case is extensive. The record consists of voluminous medical reports and the testimony presented at the hearing before the ALJ. Plaintiff was born on January 17, 1953. She has a twelfth grade education. Her previous work experience is limited. She has previously been employed as a forklift operator, a sewing machine operator, an assembly line worker, and as a shelf stocker in a grocery store. Plaintiff worked for only a short period of time in each of these positions. She has not engaged in any substantial gainful activity since January, 1982.

On January 25, 1982, plaintiff was seen by Dr. Philip C. Lehman. Plaintiff told Dr. Lehman that she hurt her back while lifting a drum of pills onto a pallet at her place of employment. She complained of low back pain and headache pain. She stood erect and could heel and toe walk without difficulty but had little motion of the lumbar spine or thoracic spine. Dr. Lehman also noted thoracic tenderness upon deep palpation. The x-rays of plaintiff's thoracic and lumbar spine showed no bony abnormalities. Dr. Lehman diagnosed muscle strain and prescribed medication and bed rest for a few days. Plaintiff returned to Dr. Lehman three times during the next two months, each time reporting no improvement in her condition. On February 22, 1982, she reported that her symptoms were much worse, but a straight leg raising test was negative.

Dr. Roger P. Jackson conducted a comprehensive physical examination of plaintiff for her insurance company on March 17, 1982. Plaintiff complained of persistent back pain and pain in the upper posterior portion of her thighs. She indicated that bending, lifting, coughing, sneezing and prolonged standing aggravated her back pain, while resting gave her some relief. Dr. Jackson's examination revealed "a healthy woman in no acute distress." He noted tenderness at the L5–S1 interspinous space but no paralumbar muscle spasm. Flexion and extension were restricted and painful, while right and left lateral bending were "slightly decreased" and painful. Neurological examination was "completely normal." Plaintiff's x-rays showed a very slight narrowing of the L5–S1 disc space, but there were no other degenerative lumbar disc disease changes. Dr. Jackson reached the following conclusion:

> This patient is complaining of persisting pain in her lower back since a reported lifting strain some 2 months ago. Her complaints appear to be mechanical in nature, and there is no evidence of a significant disc herniation or nerve root entrapment problem at this time. Her leg pain complaints appear to be on a referral basis. Again, the patient's neurological examination is completely normal. At this time I am recommending diagnostic and hopefully therapeutic facet joint injections at L4–5 and L5–S1

bilaterally. The patient is to remain off of work at this time until re-evaluated again by us after the results of this test are known.

Dr. Jackson saw plaintiff on several occasions over the next few months. Plaintiff continued to complain of back pain. He recommended various types of treatment, but none seemed to help. He continued to note that plaintiff's neurological examination remained normal. He further noted that plaintiff appeared poorly motivated.

On August 18, 1982, plaintiff was again seen by Dr. Jackson. At that time, she continued to complain of daily, severe pain which interfered with her social and recreational functioning. Dr. Jackson found that she continued to have a restricted range of motion in the back with some tenderness. Plaintiff refused Dr. Jackson's recommended diagnostic and treatment plan, and he indicated that he had nothing else to offer her. Aside from restricted back motion and tenderness, she had "no other significant objective findings," and her complaints were "somewhat out of proportion to her objective medical findings." He stated that how plaintiff lifted was more important than how much she lifted. Dr. Jackson concluded that plaintiff had a six to eight percent impairment of the body as a whole.

Plaintiff was also being seen by Dr. James L. Bowers during 1982. During these visits, plaintiff made repeated complaints of low back, cervical and headache pain. Dr. Bowers prescribed pain medications, anti-inflammatory drugs and antidepressants. On October 25, 1982, Dr. Bowers admitted plaintiff to the hospital after she complained of increased back and lower extremity pain. A CT scan revealed a "possible protrusion of the L5–S1 disc." A lumbar myelogram was negative, and an electromyographic study was "suggestive of a chronic injury." On November 9, 1982, consulting physicians recommended that plaintiff start a chronic pain control program. Dr. Bowers indicated that plaintiff could not return to her job, but assessment of a permanent disability was not possible until after the chronic pain control therapy.

Plaintiff saw Dr. Robert P. Woods for a neurological consultation on December 16, 1982. His examination revealed moderate back tenderness and some paravertebral muscle spasm, but severe limitation of back motion. Straight leg raising was positive on the left at 30 degrees and on the right at 40 degrees. A review of x-rays taken on March 17, 1982 showed some straightening of the upper spine but no significant degenerative changes. Cervical films from October 25, 1982 were found to be normal. The CT scan from October 27, 1982 showed "a little questionable narrowing" on the left side of the lumbosacral joint but was otherwise normal. The myelogram administered on November 5, 1982 revealed nerve roots "filling out well at the lumbosacral space." He concluded that "[i]t is otherwise totally normal through the whole lumbar area." Dr. Woods stated that whatever happened at the beginning of her physical problems was probably a lumbar sprain, but probably other factors of a psychological nature were protracting the condition. He found "[n]o convincing evidence of central nervous system or spinal lesion" and gave her a five percent permanent partial disability rating of the body as a whole.

Dr. Bowers again admitted plaintiff to the hospital on January 24, 1983 for further treatment of her back pain. Results of a thermogram study performed on January 26, 1983 were consistent with a left L5 spinal root radiculopathy, possibly a bilateral lesion. A CT scan revealed a "small midline protruded disc" at the L5–S1 level. Although plaintiff continued to experience pain, her condition improved during her hospitalization, and she was discharged on January 27, 1983 with a diagnosis of chronic cephalgia, lumbar and cervical pain. She was to remain on Motrin, an anti-inflammatory drug, and Elavil.

Dr. Bowers once again admitted plaintiff to the hospital on March 13, 1983 for a trial of gravity lumbar traction and chronic pain management. On admission, she was in a "minimal amount of discomfort." Dr. Bowers found that plaintiff had increased

paravertebral muscle tension and decreased range of motion over the cervical and lumbar regions of the spine. Straight leg raising was positive bilaterally at 85 degrees.

During her hospitalization, plaintiff underwent a psychological evaluation conducted by Ken Hines, Ph.D. Dr. Hines concluded that the results of the evaluation were of little value due to plaintiff's efforts "to make a good appearance of hypernormality." Dr. Hines concluded that plaintiff may have some psychosomatic tendencies but that she was probably not a good candidate for individual psychotherapy due to a refusal to accept psychological involvement. He recommended a family therapy approach.

On March 29, 1983, Dr. John P. Morse, a specialist in orthopedic surgery, performed a chemonucleolysis on plaintiff. This procedure consisted of injecting Chymodiactin, a drug used in treating herniated discs, into the L5–S1 interspace. Plaintiff was subsequently discharged from the hospital on March 31, 1983. At that time, Dr. Bowers diagnosed plaintiff's problems as herniated L5–S1 intervertebral disc, chronic cephalgia, and chronic cervical muscle spasm.

Over the next few months, plaintiff continued to complain of back pain to Dr. Morse and Dr. Bowers. At times, the doctors reported some improvements, and at other times they reported no improvement.

In a letter dated June 30, 1983, Dr. Morse indicated that plaintiff was "definitely improved at this time and has been improving on her physical therapy." Her low back showed a "returning to normal lumbar lordosis," and straight leg raising was negative. She still complained of low back pain related to the chemonucleolysis, but he found only a ten percent permanent impairment of the body as a whole. On July 11, 1983, plaintiff still complained of "various problems," but Dr. Morse's examination showed negative straight leg raising, a "relatively normal" range of back motion, and no particular areas of tenderness. Leg flexion was painless to ninety degrees. Dr. Morse released plaintiff from his care on August 2, 1983, concluding that "she had achieved maximum benefit from her surgery to the lumbar spine and was released to all activities." A period of readjustment would likely be necessary, and he prescribed muscle relaxants and exercise. He did not, however, anticipate any problems returning plaintiff to full activities.

On August 4, 1983, Dr. Bowers indicated that he was aware that Dr. Morse had released plaintiff and given her a disability rating. He stated that plaintiff might still need a laminectomy and that he would recommend a second orthopedic evaluation. On August 24, 1983, Dr. Bowers noted that plaintiff still complained of back pain and that she exhibited a decreased range of back motion and increased paravertebral muscle tension. A soft cervical collar provided some relief, and a lumbosacral brace had been prescribed.

On October 18, 1983, Dr. Rae R. Jacobs, a professor of surgery in orthopedics, evaluated plaintiff. Dr. Jacobs conducted a thorough physical examination and reached the following conclusions:

It is my opinion that this patient sustained a mild disc injury at the time of the accident in January, 1982. This is manifest primarily by mild mechanical back complaints and questionable radicular complaints. There is no significant physical findings to confirm these symptoms such as muscle spasm or significant evidence of nerve root compression.

It is my impression that she has a permanent physical impairment of between 5–10% of the whole man due to a disc injury as a result of the accident referred to in January, 1982. I do not feel that this patient can be helped by further therapy or is likely to significantly deteriorate or improve. I furthermore estimate that her condition is essentially unchanged from what it was a few months after her injury.

The first step in rehabilitation for this patient will be immediate settlement of her case. If she were interested, following this, we would be happy to arrange for her to be seen in the Back Rehabilitation Clinic to work on control of her pain

problem and getting her back into a productive way of life. I would estimate that this would require no more than 4–5 visits. I do not think that such a program would be of any value until the case is settled.

On November 15, 1983, Dr. Nelson G. Escobar, a specialist in neurological surgery and emergency medicine, examined plaintiff. He reported the usual symptoms. He concluded that plaintiff had "persistent S1 radiculopathy, marked on the left side" and would not be motivated to return to work until after surgical exploration. He saw no option other than to offer surgery.

On December 12, 1983, Dr. Bowers reported that plaintiff had fallen when her right leg gave out, and that her right thigh revealed a bruise over a four-inch by twelve-inch area. In addition to Dr. Bowers' correspondence, his office notes from 1983 show numerous visits from plaintiff and continual complaints of pain. He prescribed Demerol, Percodan, Midrin, Talwin and Darvocet for pain; and Valium, Tranxene and Quaalude for nerves.

Dr. Escobar performed a left hemilaminectomy, discectomy, and foraminotomy on January 20, 1984. Dr. Escobar saw plaintiff again on February 22, 1984 and noted that plaintiff had some lumbosacral tenderness and occasional radicular pain down her left leg which she felt had improved subsequent to surgery. Straight leg raising was positive at eighty degrees, but she could walk "without much difficulty."

On April 17, 1984, Dr. Bowers reported that plaintiff had fallen two more times. After the first fall on March 25, 1984, x-rays revealed sacrococcygeal and intercoccygeal osteoarthritis. Her symptoms were, however, improving by March 28, 1984. By July 6, 1984, Dr. Bowers reported gradual improvement and reduction in the frequency of medication. He concluded that plaintiff was completely disabled and that she would eventually have a final disability rating of fifty to seventy-five percent. On October 17, 1984, Dr. Bowers reported that plaintiff continued to improve and indicated that he expected her to continue improving. Nevertheless, he did not foresee a complete recovery. Dr. Bowers noted that she was tapering off her pain medication and attending a back school program.

Dr. Bowers' office notes for 1984 reveal frequent visits from plaintiff with the standard complaints of pain. Dr. Bowers prescribed a variety of medication for pain, nerves and depression.

On November 2, 1984, Dr. Escobar stated that plaintiff had persistent complaints of pain in her low back, episodic parasthesia in the lower extremities, episodic weakness of both arms, and occipital headaches. He believed her pain would be chronic and that she was not physically or psychologically ready or motivated to resume her previous job. He recommended a psychological evaluation and gave her a rating of twelve to fifteen percent permanent partial disability for her low back pain, and three to five percent for her chronic cervical pain and headaches.

Plaintiff saw Dr. Escobar again on November 14, 1984, at which time she reported attending a back school program and doing lumbosacral exercises. She complained of muscle stiffness, bilateral leg pain, and burning from the hips to the back of both calves. Dr. Escobar noted that she was able to heel and toe walk without assistance. He concluded that she was "much improved." He stated that she did not appear psychologically motivated to do any kind of work, even at home.

On February 26, 1985, Dr. Bowers reported that plaintiff "was progressing quite well until recently." She had discontinued use of the cervical collar and all medications except Elavil. Dr. Bowers noted that on January 28, 1985, plaintiff had an episode of left lower extremity weakness resulting in a fall onto her bed. Subsequently, she noticed muscle spasm in her left foot causing intermittent flexing of her toes, which persisted during Dr. Bowers' examination. Dr. Bowers noted that her prognosis remained guarded.

Plaintiff last saw Dr. Bowers on March 5, 1985. At that time, he prescribed Parafon Forte and Quinine Sulfate for treat-

ment of night leg cramps. He continued to conclude that her prognosis remained guarded.

Dr. Bowers referred plaintiff to Dr. John P. Cox, a neuropsychiatrist, for psychological evaluation. Dr. Cox noted that plaintiff was appropriate, relaxed and friendly. She showed no serious thought disorder and appeared of normal intelligence. She complained of pain in her low back, right lower leg and head, which caused her to severely restrict her activities. According to Dr. Cox, plaintiff felt that there must be some medical or surgical treatment to relieve her pain. Dr. Cox diagnosed plaintiff as suffering from a dysthymic disorder, a depressive neurosis secondary to her injuries and her lack of relief from treatment.

Plaintiff was examined again by Dr. Jacobs in May, 1985. This examination revealed no consistent sciatic tightness and no motor weakness. A CT scan of May 3, 1985 was read as showing L5–S1 abnormalities, but Dr. Jacobs indicated that this was "simply redundant annulus with some scar in the canal." Dr. Jacobs concluded as follows:

[M]y opinion is essentially that as it was before, that this patient has a mild disc herniation with minimal symptoms which has now failed to respond to surgical treatment as we predicted. My recommendations are as before, namely to immediately cease medical treatment in this case as continuation of this program will increase rather than decrease this patient's disability by resulting in a tremendous increase in psychological dependence on medical care which will be fruitless as well as medication addiction, etc. I would estimate this patient to have a permanent partial impairment equal to 5–10% of the whole man due to a mild disc herniation as stated previously.

In a letter dated May 30, 1985, Dr. Escobar indicated that plaintiff will always have a chronic complaint and "most likely will not be able to return to her previous job." On September 24, 1985, he recommended that her worker's compensation sick leave be discontinued. He concluded as follows:

[T]his lady has chronic low back pain with a great deal of psychological overlay. She has not cooperated or responded to any of the modalities of treatment offered to her as predicted from the initial results post first laminectomy and as predicted by Dr. Jacobs, she has not responded to the second lumbar laminectomy but has been more than an excuse to hold on to or increase her complaints. I do believe that she is a psychiatric case which most likely will not respond to any treatment unless she changes her attitude.

Some additional x-rays were taken on October 11, 1985. These x-rays showed essentially a normal shoulder and lumbosacral spine except for some post-operative spine changes. No spondylolysis or spondylolosthesia was found.

Plaintiff saw Dr. Cox again on October 11, 1985 for another neuropsychiatric examination. She told Dr. Cox that none of her previous treatment had improved her condition and that she took Extra Strength Tylenol or Arthritis Pain Formula for pain. She indicated that most of her time was spent lying down, but she enjoyed watching television and reading. She visited nearby friends and relatives several times a week. Plaintiff stated that she did drive and that she had driven the 25 to 30 miles to the examination. The neurological examination revealed a full range of neck motion but very limited flexion of the lumbar spine. There was full range of motion in all joints and no atrophy in the upper extremities. Her grip was strong and she exhibited normal fine coordination. There was no atrophy or sensory deficit in the lower extremities. However, straight leg raising and hip flexion were limited. Dr. Cox diagnosed plaintiff's condition as "probable psychogenic pain disorder." He concluded as follows:

It would be my clinical impression that she might well be able to relate adequately to fellow workers and supervisors. I believe she can understand and follow simple instructions as well as maintain enough attention to perform simple repetitive tasks. I believe that

with encouragement, she could withstand the stress and pressures of ordinary work activity.

At the hearing before the ALJ, plaintiff testified that her pain had become worse since she hurt her back in January, 1982. She further indicated that her activity level had decreased since September, 1985 and that treatment had not improved her condition. Moreover, she believed that some of the treatment had caused her condition to deteriorate. At the hearing, she was wearing a cervical collar, which she reported wearing two to four hours per day for the last two to three years.

She stated that she had seen two physicians within the previous year, Dr. Bowers and Dr. Fuhrbacher, a chiropractor. She noted that financial problems prevented her from returning to Dr. Bowers after October, 1985, but the chiropractor did not charge her for his services. She last saw Dr. Fuhrbacher three months prior to the hearing. She claimed that she had not taken prescription medications since October, 1985 because they were not effective and she was concerned about becoming addicted. For pain relief, she took Extra Strength Tylenol.

In assessing her own residual functional capacity, plaintiff estimated that she could sit for five minutes, stand for five minutes, and walk up to one-half mile per day, although on some days she was limited to less than one-half mile. She indicated that she could not bend, stoop or crawl without pain. She testified that she could only lift five pounds. Her daily activities consisted of getting up and walking around the house. She said that she did not go outside much because she had fallen twice in the previous month. Most of her time was spent lying down and resting with legs elevated, although she reported doing back exercises twice a day and visiting friends about once a week. She indicated that she last drove a car prior to her injury in 1982 and that her children did the housework.

George Robert McClellan, a vocational expert, also testified at the hearing before the ALJ. Prior to stating his opinion, Mr. McClellan reviewed the evidence of record and observed plaintiff at the hearing. He testified that a person of plaintiff's age, with a twelfth grade education, and plaintiff's work experience, who was limited to simple repetitive tasks and work activity involving occasional bendings, crawling, stooping, climbing, rotating of the back, kneeling, squatting, and lifting up to 10 pounds frequently or up to 20 pounds occasionally, could not perform any of plaintiff's former jobs as she performed them. He stated, however, that such a person could perform other jobs existing in the national economy such as laboratory or hospital cleaner, hand packager, or child care attendant. He further opined that if all of plaintiff's allegations were accepted as credible, she could perform no work.

The ALJ concluded that plaintiff could not perform her past relevant work but that she generally had the residual functional capacity to do a full range of light work. He found that plaintiff's allegations of disabling pain were only partially credible. He reached this conclusion after a thorough examination of the medical record and plaintiff's testimony at the hearing.

Plaintiff asserts that the ALJ incorrectly evaluated the medical evidence in concluding that the medical reports reveal only minimal abnormalities and that they are not consistent with her complaints. Plaintiff argues that the ALJ did not properly consider her diagnosed psychological condition of dysthymic disorder in addition to her physical ailments. She further contends that the ALJ erroneously discounted her testimony as to the disabling nature of the pain she experiences. Finally, plaintiff asserts that the ALJ improperly relied on the testimony of the vocational expert because the hypothetical question posed by the ALJ to the vocational expert was incomplete.

In reviewing the ALJ's decision, we must examine the medical evidence based on the rules established by the Tenth Circuit for evaluating physicians' reports. The ALJ must give substantial weight to the testimony of plaintiff's treating physician unless good cause is shown to the contrary. *Eggleston v. Bowen,* 851 F.2d

1244, 1246 (10th Cir.1988). If the opinion of the plaintiff's treating physician is to be disregarded, specific, legitimate reasons for the actions must be set forth. *Id.* The opinions of physicians who have treated a patient over a period of time or who are consulted for the purposes of treatment are given more weight than are reports of physicians employed and paid by the government for the purpose of defending a disability claim. *Broadbent v. Harris,* 698 F.2d 407, 412 (10th Cir.1983).

■ The court has undertaken a thorough review of the evidence in the record because we regard this matter as a close case. One of plaintiff's treating physicians, Dr. Bowers, has indicated that plaintiff is "completely disabled." However, the other physicians who have examined and treated her have not reached that conclusion. Dr. Jackson was not convinced that plaintiff was disabled. He found that her complaints of pain were exaggerated. He determined that plaintiff had only a six to eight percent impairment of the body as a whole. Dr. Woods examined plaintiff and found little objective evidence to support her subjective complaints. He believed that psychological factors were protracting her condition. Dr. Morse released plaintiff to all activities on August 2, 1985. Dr. Morse found a "relatively normal" range of back motion and negative straight leg raising. Dr. Jacobs was emphatic in her conclusion that plaintiff was not completely disabled. She found no physical findings to confirm plaintiff's symptoms. She determined that plaintiff had only a five to ten percent impairment of the body as a whole. Dr. Escobar also failed to find any significant neurological deficits during repeated examinations despite plaintiff's constant complaints of pain. He noted plaintiff's lack of motivation and lack of compliance with prescribed treatment in concluding that plaintiff would not benefit from further treatment "unless she changes her attitude." Dr. Cox also failed to indicate that plaintiff was totally disabled. He noted that plaintiff probably suffered from a "psychogenic pain disorder," but that she could engage in ordinary work activity with encouragement.

In reviewing the ALJ's decision, the court finds that proper consideration was given to the views of all physicians who had input. The ALJ correctly evaluated the opinions of each physician in light of the record as a whole. Moreover, the ALJ properly considered both plaintiff's physical and mental problems. In evaluating plaintiff's pyschogenic pain disorder, the ALJ noted that Dr. Cox had indicated that plaintiff could withstand the stress and pressure of ordinary work activity. The decision of the ALJ is supported by substantial evidence, although the record does contain conflicting opinions on the plaintiff's ability to work.

The court also finds that the ALJ properly considered plaintiff's subjective complaints of pain. In *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), the Tenth Circuit set forth the framework that is to be used in evaluating a disability claim based on pain. The Court stated:

If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reasonably be expected to produce' the *alleged* pain." ... If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling.

*Id.* at 163 (citation omitted).

The ALJ proceeded to the determination of whether, considering all the evidence, the plaintiff's pain was in fact disabling. The ALJ found that plaintiff's subjective complaints were only "partially credible." In reaching this decision, the ALJ thoroughly examined all of the evidence in the record. We find that substantial evidence exists for the ALJ's conclusion. In making this finding, we note that the determination of credibility is left to the observations made by the ALJ as the trier of fact. *Talbot v. Heckler,* 814 F.2d 1456 (10th Cir. 1987). Great deference should be given to the ALJ's conclusions on credibility. *Fowl-*

er v. Bowen, 876 F.2d 1451, 1455 (10th Cir.1989). The ALJ carefully considered the credibility of the plaintiff's subjective complaints of pain. The ALJ did not ignore them; rather, he properly weighed them in light of the entire record.

Finally, regarding the hypothetical question the ALJ posed to the vocational expert, we find no merit to the plaintiff's argument. A hypothetical question posed by an ALJ to a vocational expert need not include every physiological impairment suggested by the evidence. See *Brown v. Bowen*, 801 F.2d 361, 363 (10th Cir.1986). For the purposes of review, the ALJ is required to set forth those physical and mental impairments in the hypothetical which are accepted as true by the ALJ. *Baugus v. Secretary of Health and Human Services*, 717 F.2d 443, 447 n. 5 (8th Cir.1983). The ALJ here properly posed the hypothetical question to the vocational expert in conformance with the aforementioned standards.

In sum, this court's review of the whole record leaves us with the firm impression that the ALJ's decision is supported by substantial evidence. The record does contain sufficient evidence to support the conclusion that plaintiff is not disabled. The fact that not all of the evidence supports that conclusion does not preclude the determination made by the ALJ.

IT IS THEREFORE ORDERED that the defendant's motion for an order affirming the Secretary be hereby granted. The decision of the Secretary is hereby affirmed.

IT IS SO ORDERED.