William R. STEWART, Plaintiff,

v.

Shirley CHATER, Commissioner of Social Security, Defendant.

Civil Action No. 96–K–26.

United States District Court, D. Colorado.

Feb. 4, 1998.

Pamela J.B. Adams, Steven V. Mullens, P.C., Steven Ulysses Mullens, Colorado Springs, CO, for Plaintiff.

Richard C. Kaurman, U.S. Attorney's Office, Civil Division, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiff William Stewart, appeals from a final decision of the Social Security Commissioner denying him Social Security Disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. The denial was based on the determination of the Administrative Law Judge (ALJ) that Stewart had the residual functional capacity to perform a significant number of jobs in the national economy. Jurisdiction exists under 42 U.S.C. § 402(g).

Stewart asserts the ALJ's determination that he had the residual functional capacity to perform a significant number of jobs in the national economy was not supported by substantial evidence and is therefore subject to reversal. I agree.

## I. BACKGROUND.

Plaintiff, a heavy equipment operator living in Buena Vista, Colorado, injured his right knee on September 3, 1991. He was 41 years old. He evaluated by Dr. Timothy McLeod, an orthopedic surgeon, who found effusion and a loose body in the knee along with "marked osteoarthritis" of the knee joint.

Stewart reinjured the knee kneeling a few weeks later and Dr. McLeod performed arthroscopic surgery on Stewart's knee on October 31, 1991. McLeod initially released Stewart to light work. A slip on ice in December, together with the arthritis and other minor strains to the knee, caused further degeneration of Stewart's knee and an inability to return to the heavy work he had done for most of his adult life. By favoring the knee, Stewart also developed degenerative changes in his left knee and back pain.

In June 1992, Dr. McLeod found Stewart had reached maximal medical Improvement with respect to the arthroscopic surgery. He characterized Stewart's prognosis as poor and stated Stewart's knee would continue to deteriorate in the future. This was confirmed in a second opinion by Dr. Bruce Evans, who also stated Stewart would eventually require a total knee replacement. (R. 131–33.) Dr. McLeod wrote a letter in Octo-

ber 1992 to clarify that maximum medical improvement related solely to the surgery and that Stewart's overall prognosis remained poor due to the osteoarthritis of the knee joint. (R. at 218.) Dr. McLeod also concurred with Dr. Evans that Stewart will "in all likelihood" require "total knee replacement in the not too distant future." (*Id., see also* R. at 288) (Dr. McLeod notes from January 1993 documenting discussions regarding options for knee fusion or "mak[ing] his right knee last as long as possible before total knee replacement.")

Over the next year, Dr. McLeod tried several anti-inflammatory medications to ease the effects of Stewart's arthritis. Other medications, including Valium, were tried to alleviate nightly cramping Stewart suffered in his hamstring muscles and those in the back of his knee. (R. at 295–96.) Stewart was prescribed Vicodin for his pain. Despite adjustments to types of drug and dosages, Dr. McLeod determined Stewart could "not tolerate" any of the anti-inflammatory drugs tried to alleviate the arthritis. (*Id.* at 297, *see generally* R. at 293–97 (medical notes describing allergic reactions to Nalfon, Orudis and Relafen).) Even aspirin gave Stewart nosebleeds (*id.* at 293), leading Dr. McLeod to comment that he had "little to offer him [in terms of anti-inflammatory drugs] at this point in time except conservative treatment and observation of his knee joint." (*Id.* at 297.)

By June 1993, Stewart's knee had deteriorated to the point that Dr. McLeod declined to release him for employment of any kind. (R. at 201–02.) In his responses to a Physical Restrictions Questionnaire sent to him by vocational rehabilitation counselor Tonya Wheatley–Herman, Dr. McLeod described Stewart's limitations as follows: Stewart could sit for two hours at a time up to eight hours a day; stand for one hour at a time up to four hours per day; and walk one hour at a time up to three hours per day. (*Id.*) Stewart could never lift, carry, push, or pull weights above 35 pounds; could only bend, twist and climb stairs occasionally and could

never squat, crawl or climb ladders. (*Id.*) He was restricted from working at heights or on wet surfaces. (*Id.*) While Stewart could occasionally use his right and left legs for repetitive movement as in operating foot controls, he needed the freedom to change positions frequently. (*Id.*) Dr. McLeod described these restrictions as permanent. (*Id.*) While Dr. McLeod placed no restrictions on Stewart's use of his upper extremities for repetitive motions, he stated Stewart was in need of vocational rehabilitation services. (*Id.*)

In a detailed report dated July 30, 1993, Wheatley–Herman concluded Stewart did not have the skills necessary to become employed in the Chaffee County area given his vocational experience, education and physical limitations. (R. at 198–99.) Wheatley–Herman based her conclusion on her review of Stewart's medical and vocational history, Dr. McLeod's responses to the physical restrictions questionnaire, and a computer-aided analysis of Stewart's transferable skills and loss of employability (*Id.* at 190–99.)

Specifically, Wheatley–Herman found the transferable skills noted on the revised LMA+92 [1] computer printout qualified Stewart for jobs such as School Bus Monitor, Traffic/Shipping/Receiving Clerk and Stock/Inventory Clerk, but determined these jobs did not represent "realistic employment options for Mr. Stewart" because of his physical limitations on standing and walking and the fact that none of the jobs was available at the time in Chaffee County. (*Id.* at 199). Wheatley–Herman concluded Stewart's actual loss of access to employment was 100% and that he was permanently and totally vocationally disabled. She agreed with Dr. McLeod that Stewart required training to learn a sedentary skill, but noted Stewart had not been offered vocational rehabilitation services. (*Id.*) Based on Stewart's current skills, vocational history, educational background and physical limitations, it was Wheatley–Herman's opinion that Stewart was unable to return to the work force. (*Id.*)

---

1. *Labor Market Access Plus 92* computerized DOT search program. The LMA+92 updates the LMA+90 which searches the entire *Dictionary of* *Occupational Titles* for jobs that a client has the aptitudes, physical abilities and experience to perform before and after an injury.

Stewart continued in treatment with Dr. McLeod. In December 1993 he was seen for muscle spasms behind his right knee that kept him awake at night and was again prescribed Valium. (R. at 296.) Stewart also complained of back trouble. (Id.) McLeod stated that x-rays taken in January 1994 showed "rather marked degenerative change with osteophytic spurring in the lower portion of the thoracic spine" and "large anterior spurs and ostephytes." (Id., see also R. at 301.) Dr. McLeod diagnosed "bilateral spondylosis with a Grade I spondylolisthesis at L5 on S1." (Id., see also R. at 244.) In addition to Vicodin for his back pain, Dr. McLeod recommended Stewart exercise in the Hot Springs Pool to strengthen his back. (R. at 296.)

Dr. McLeod reexamined Stewart and summarized his impressions in a letter dated November 16, 1994. (R. at 244.) The letter stated Stewart continues to have degenerative arthritis in his right knee and intermittent pain from it. Dr. McLeod specifically addressed Stewart's back pain, documenting the "bilateral spondylosis with Grade I spondylolisthesis" diagnosis and stating this gives Stewart "occasional sciatica with radiation into the right leg." On the date of the examination, Dr. McLeod stated Stewart was neurologically "intact," but that the knee and back conditions were "permanent and will deteriorate over time." (Id.)

On December 1, 1994, Wheatley–Herman again requested physical restrictions from Dr. McLeod in order to prepare another employability assessment. Dr. McLeod complied, describing the same restrictions as those stated in his June 1993 assessment. (Compare R. at 200–201 with R. at 256–57.) In addition, Dr. McLeod imposed environmental restrictions including a need to avoid extreme cold, wet/humid conditions, noise, vibration, working with moving parts, and dust/fumes. (Id. at 257.) In the second assessment, Dr. McLeod answered "yes" to the question of whether Stewart was taking any medication that "might affect his ability to work," listing the Vicodin Stewart was taking for his back pain. (Id.) Dr. McLeod released Stewart to "alternate full time work within above stated restrictions," but again

stated that Stewart would need vocational retraining in order to do so. (Id.)

Wheatley–Herman completed her second vocational assessment report on December 5, 1994, using the light work limitation with environmental and other restrictions on standing, walking, bending, balancing, kneeling, crawling, climbing stairs, and crouching from Dr. McLeod's December assessment. (R. at 247–255, 251.) Wheatley–Herman conducted LMA + 92 searches for both Chaffee County and nationally, concluding Stewart had access to zero jobs in either labor market. (R. at 254.) It was Wheatley–Herman's opinion that Stewart did "not have the transferable skills that would enable him to work in a sedentary or light duty job within his physical limitations without further vocational training." Because "no retraining benefits were offered by the insurance carrier," Wheatley–Herman concluded Stewart was "unable to participate in Substantial Gainful Activity" and was not "employable in any job which fits within his current physical limitations." (Id. at 255.)

At the administrative hearing, the ALJ heard testimony from Wheatley–Herman, Stewart, and court-appointed vocational expert, Kenneth Olson. Stewart's testimony focused on his day-to-day activities, his efforts to find work, his pain, and the side-effects of his medication. (R. 305–24.) He testified that he had begun using a cane occasionally and that pain and burning in his knee was a daily occurrence. (R. at 309–10.) He described the cramping and "locking up" he experienced in and behind his knee (id.) and stated he continued to have back pain. (R. at 311.) Stewart stated he could be up (standing or walking) no more than 30 minutes without pain (id. at 310–11), and could sit in a non-reclining position comfortably for only 30 minutes to an hour. (Id. at 312.) The Vicodin he took daily for his pain made him groggy for an hour or two each time he took it. (R. at 319–20.)

Stewart also testified that the pain in his knee affected his sleep. By the end of the day, he said, his knee was often so sore that it was 2:30 or 3:00 in the morning before the Vicodin would "set in enough" so he could sleep. (R. at 313.) Even with the Vicodin,

Stewart stated he woke up at least twice a night from the pain in his knee. (*Id.* at 314.) As a result, Stewart stated he was frequently tired and needed to nap during the day. Stewart and his wife had been living off the settlement he received from his workers' compensation case and the money his wife had made the previous summer by working at a gift shop. (R. at 320–22.) Stewart told the ALJ they were "hurting," and that he had "tried real hard to find anything [employment] that would have paid." With his physical restrictions, Stewart stated, "nobody would hire me." (R. at 322.)

Court-appointed vocational expert Olson asked Stewart about his work history (R. at 331–34) and then answered a series of hypothetical questions from the ALJ. (*Id.* at 334–45.) Olson was asked for his opinion both considering, and then not considering, Stewart's additional testimony regarding pain, decreased ability to sit and stand for longer than 30 minutes to an hour, and drowsiness. Without considering this testimony, Olson opined that an individual with Stewart's vocational profile and physical limitations was employable at the sedentary to light level in jobs such as welder, auto mechanic, assembly worker, packager, auditing/accounting clerk, cashier, and protective service worker, which existed in significant numbers both nationally and in Colorado. (R. at 337–42.) When asked for his opinion considering Stewart's need to change positions and drowsiness, Olson's opinion was that all of the jobs, with the possible exception of some unskilled assembly jobs,[2] would be eliminated. (R. at 342–47.)

In his written decision, the ALJ found Stewart met the disability insured status requirements of the Act on November 3, 1991, and continued to meet them through the date of the decision. (R. at 54, ALJ Finding No. 1.) He further found Stewart was unable to perform his past relevant work as a heavy equipment operator, crane operator, miner, track laborer, mechanic, welder, air tool mechanic, construction worker, or truck driver. (*Id.* at 55, Finding 6.) The ALJ accepted the physical limitations described by Dr. McLeod in his physical assessments, but discounted Stewart's additional complaints of disabling pain,[3] decreased ability to sit and stand, and his need to nap. (R. at 51–54, Findings 3–5.) The ALJ also rejected Stewart's claims of drowsiness related to the Vicodin, finding it "puzzling" that Stewart had never reported "the alleged side effects from Vicodin" to Dr. McLeod or "requested alternative medications." (R. at 51.) The ALJ concluded Stewart had the residual functional capacity for sedentary to medium work, reduced only by the limitations described by Dr. McLeod. (*Id.* & Finding 7.)

The ALJ discounted Wheatley–Herman's opinion that the physical limitations by Dr. McLeod rendered Stewart unemployable, adopting instead Olson's opinion to the contrary. Based on his finding that an individual with Stewart's vocational profile and physical limitations was capable of performing a significant number of jobs in the national economy (R. at 50–57, Findings 3 4, 11), the ALJ concluded Stewart was not under a "disability" as defined by the Social Security Act at any time through the date of the decision. (R. at 56, Finding 12, citing 20 C.F.R. § 404.1520(f).)

The Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (1997). This appeal ensued.

## II. *STANDARD OF REVIEW.*

I am limited in my review of the agency's final decision to determining (1) whether the Secretary applied the correct legal standard;[4] and (2) whether the record as a

---

**2.** Olson was "unsure" whether the factor of drowsiness would impact the ability to do unskilled assembly jobs. (R. at 347.)

**3.** The ALJ accepted the third-party statement of Livy Smith supporting Stewart's pain allegations as "sincere and genuine," but discounted it as being based on Stewart's presentation of his pain and limitations, "which have not been accepted as fully credible." (R. at 55, Finding No. 4.)

**4.** The failure to provide the reviewing court with a sufficient basis to discern whether the correct legal standard was applied is also grounds for reversal under this standard. *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir.1988) (citations omitted).

whole sets forth substantial evidence to support the Secretary's final decision. *Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495, 1497 (10th Cir.1992); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.1988). Substantial evidence is that which a reasonable person would accept as adequate to support that determination. *Hamilton* at 1498. "'Evidence is not substantial if it is overwhelmed by other evidence ... or if it really constitutes not evidence but mere conclusion.'" *Williams* at 750 (quoting *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985)).

While I may not substitute my judgment for that of the ALJ, *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir.1987), I must do more than merely rubberstamp his decision. *Pettyjohn v. Sullivan*, 776 F.Supp. 1482, 1484 (D.Colo.1991), *remanded for further findings on other grounds sub nom., Pettyjohn v. Shalala*, 13 F.3d 406 (10th Cir. 1993) (unpublished decision), *on remand*, 874 F.Supp. 305 (D.Colo.1995). Decisions in which substantial evidence was disregarded or which are based on the culling of isolated bits of evidence from the record to support a preconceived conclusion will not satisfy the substantial evidence test. *Pettyjohn*, 776 F.Supp. at 1486. Proper review requires a "meticulous" examination of the record in its entirety. *Williams*, 844 F.2d at 750. If I find upon such review that the decision is not supported by substantial evidence, then I must reverse. *Id.*

### III. MERITS OF THE APPEAL.

The Commissioner has established a five-step evaluation process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir.1988) (describing the five steps in detail). The claimant bears the burden of proof through step four of the analysis. *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir.1993). Once the Commissioner has determined at step four that the claimant cannot perform his past relevant work, the claimant has established a prima facie case of disability. *Id.* At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account his residual functional capacity, age, education and work experience. *Id.*

Here, the ALJ reached the fifth step of the analysis. (R. at 55, Finding 6.) Thus, the Commissioner had the burden to show that, beginning November 3, 1991 (the latest date at which Stewart contends he was unable to work), Stewart could perform a significant number of jobs in the national economy. The ALJ wrote that "[i]n this case that burden is satisfied by [the] testimony of a vocational expert [Olson]." (R. at 53.)

Olson's testimony is problematic for several reasons, but particularly in the selective manner in which it was applied by the ALJ. The ALJ relied on Olson's testimony to find Stewart capable of performing a range of jobs at the sedentary to medium level. (Finding 7.) Olson's testimony does not support this conclusion. While Olson testified generally that an individual with Stewart's work history would have acquired skills transferrable to work as a welder, assembler or auto-mechanic at the light to medium level, this was in response to questions in which he was asked to consider only Stewart's age, education and work experience. (R. at 335.) When the ALJ asked Olson also to consider Stewart's physical restrictions and limitations, Olson's testimony was that none of these jobs would be available. (R. at 339–40.) From that point on, the colloquy between Olson and the ALJ focused exclusively on the range of sedentary jobs an individual with Stewart's physical limitations would be capable of performing. Olson's testimony, and the ALJ's ultimate finding, was that Stewart had a residual functional capacity of less than the full range of sedentary work. (R. at 55, Finding 7 & 11.)

According to the Commissioner's own policy interpretation, an RFC of less than the full range of sedentary work reflects "very serious limitations resulting from an individual's medical impairments and is expected to be relatively rare." Soc. Sec. Rut. 96–9p, 1997 WL 374185 *1 (Jul. 2, 1996). While such limitations do not dictate a finding of "disabled" for persons under 50 years of age, Ruling 96–9p makes clear that the Commissioner must consider carefully the extent the

sedentary occupation base has been eroded by the individual's additional exertional and nonexertional limitations, and make specific findings accordingly. *Id.* at 3–4. In this case, both Wheatley–Herman and Olson provided testimony in this regard. Wheatley–Herman's computer analysis, which specifically addressed each of the physical restrictions identified by Dr. McLeod and considered the actual occupational base in Colorado and Chaffee County where Stewart resided, came up with zero jobs. Olson's more general testimony spoke to a hypothetical claimant and did not consider the occupational base in rural Chaffee County. Even so, the only jobs Olson came up with for all of Colorado were 25 to 30 skilled assembly jobs, reduced by 50% based on a need to change positions; 117 security guard jobs; 1,286 auditing clerk jobs, reduced by 50–75% based on a need to change positions; and 1,696 "movie theater or cafeteria" cashier positions. (R. at 343–44, adopted verbatim as Finding 11.) When the additional factor of drowsiness was considered, Olson's testimony changed to zero available jobs.

Thus, in order to adopt Olson's testimony that an individual such as Stewart could perform jobs that existed in the Colorado economy, the ALJ had not only to overcome the testimony of Wheatley–Herman, but also Stewart's testimony regarding drowsiness.

With respect to Wheatley–Herman, the ALJ found her testimony "inconsistent" with other statements she had made and discounted it as lacking credibility. (R. at 52.) Specifically, the ALJ pointed to Wheatley–Herman's statement that "retraining would be needed in order for [Stewart] to [perform sedentary or lighter duty jobs]," and found it "directly contrary" to her statement that "there were no jobs which [Stewart] could perform taking into consideration his vocational profile and physical limitations." By way of explanation, the ALJ stated

> [w]hile Ms. Wheatley–Herman testified claimant is not capable of any substantial gainful activity, she has also stated claimant needs retraining for a less demanding job *thus suggesting claimant would be 'capable' of meeting the demands of a retraining program and a job other than the*

*heavy work he has performed in the past.* For this reason, Ms. Wheatley–Herman's statements and testimony that there are no jobs claimant can perform must be discounted.

(R. at 52 (emphasis added).)

■ The statements are not inconsistent. Stewart was, in Wheatley–Herman's opinion, unemployable without retraining and, as a result, would need retraining to return to work. Because Stewart had been offered no retraining, Wheatley–Herman concluded he was presently "unemployable." This is entirely logical and consistent with Dr. McLeod's statements in his December 1994 physical restrictions report that Stewart was "[r]eleased to alternate full time work within the [stated] restrictions" but that Stewart "will need vocational retraining in order to return to work." (R. at 257.) Accordingly, the ground stated for discounting Wheatley–Herman's testimony, namely, its "inconsistency," is not supported in the record.

Furthermore, the suggestion that Stewart's ability to participate in retraining is conclusive of his ability to engage in substantial gainful activity is clearly erroneous. The regulations implementing the Act specifically state that the Commissioner generally does "not consider activities like taking care of yourself household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity." 20 C.F.R. §§ 404.1572(c), 416.972® (1997). While these activities may be considered as evidence in a determination of a claimant's entitlement to benefits, they are not by themselves conclusive of the ability to engage in substantial gainful activity, particularly where there is medical and vocational expert testimony to the contrary. *See Markham v. Califano,* 601 F.2d 533, 534 (10th Cir.1979). The use of this argument is particularly disingenuous here, where the ability to participate in retraining was entirely hypothetical because no retraining had been offered.

Wheatley–Herman's testimony, and her attendant reports, were thorough and supported by a detailed analysis of the medical record and other evidence. The ALJ's rejection of it, on the grounds stated, was not supported by substantial evidence.

■ Similarly unsupportable was the ALJ's rejection of Stewart's complaints regarding drowsiness as lacking credibility. The ALJ stated he "[could] not accept" Stewart's testimony that Vicodin (prescribed for Stewart's pain) resulted in him needing to lie down each time he took it, and offered three reasons. (Decision at 16, R. at 51.) First, the ALJ stated Stewart had taken Nalfon in the past, "which was effective in controlling his symptoms." Nalfon, however, is an entirely different medication prescribed to Stewart as an anti-inflammatory, not for pain. Moreover, Dr. McLeod discontinued Nalfon after Stewart developed a serious allergic reaction to it. (R. at 293–94.) Second, the ALJ pointed to the fact that Dr. McLeod's notes "[did] not reflect any reported side effects" from the use of either Vicodin or Valium. The ALJ found it "puzzling" that Stewart had neither "reported" the drowsiness to Dr. McLeod nor "requested alternative medications." The suggestion that drowsiness with either drug is unusual or should have caused Stewart to request alternative medications is dubious.[5] Stewart's failure to "report" his drowsiness is more likely the result of his having read the warning label on his prescription bottles such that he knew to expect to feel drowsy than "evidence" Stewart was exaggerating his reaction to the medication. Finally, the ALJ questioned Stewart's credibility regarding his need to nap every day stating that "such need ha[d] never been reported to Dr. McLeod who presumably would have considered that need in the restrictions he placed on claimant's ability to work." While it is true Dr. McLeod did not say Stewart had to be able to nap every day, he did say the Vicodin Stewart was taking for pain "might affect his ability to work." (1994 Physical Restriction Report, R. at 257.)

In sum, the ALJ's decision rests on isolated bits of evidence culled to support a specific conclusion. The record, viewed as a whole, does not support the rejection of Wheatley-Herman's testimony or Stewart's testimony regarding drowsiness and the related effects of his pain and pain medication. The ALJ's conclusion that Stewart retained the residual functional capacity to perform a range of sedentary jobs available to him in Colorado is unsupported by substantial evidence in the record and must therefore be reversed.

## IV. *CONCLUSION.*

In reversing the Commissioner's final determination, I retain the discretion either to remand the case for further administrative proceedings or to order an award of benefits directly. *Nielson v. Sullivan,* 992 F.2d 1118, 1122 (10th Cir.1993). Where a claimant has established a *prima facie* case of entitlement and the record is fully developed, there is no reason to remand. *Id.* Accordingly,

IT IS ORDERED that William R. Stewart shall be awarded disability benefits beginning November 3, 1991.

---

5. Vicodin is a semisynthetic narcotic, with "multiple actions qualitatively similar" to codeine, and is prescribed for pain. Valium is prescribed for muscle spasms. Side effects of both include drowsiness, fatigue, lethargy, and impairment of mental and physical performance. *Physician's Desk Reference* (52d ed.1998).