**Regina R. KOENIG, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.**

**No. Civ.A. 98–2421–KHV.**

United States District Court, D. Kansas.

Aug. 17, 1999.

---

Joan H. Deans, J. H. Deans Law Office, Raytown, MO, for plaintiff.

Angela D. Gupta, Office of United States Attorney, Kansas City, KS, Christina L. Medeiros, Office of United States Attorney, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the Court on plaintiff's *Motion for Judgment* (Doc. # 10) filed April 1, 1999. Plaintiff brings suit under 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's decision to deny her benefits under the Social Security Act ("SSA"). For reasons set forth below, plaintiff's motion will be overruled and the Commissioner's decision will be affirmed.

### Factual Background

On August 25, 1992, plaintiff applied for supplemental security income ("SSI") disability benefits under Title XVI. (Tr. 33–45). The Social Security Administration denied her request throughout the administrative process. (Tr. 3–4, 8–18, 46–50, 63–65). Plaintiff sought review in this Court. On July 31, 1996, the Court remanded the case to the Commissioner to make a finding with respect to plaintiff's alleged sleep impairment. (Tr. 253–71). The administrative law judge ("ALJ") who had initially denied plaintiff's claim then disqualified himself. (Tr. 234, 278). The SSA assigned the case to another ALJ, who remanded the case to the Kansas State Agency—Disability Determination Services for evaluation of plaintiff's alleged mental impairment. (Tr. 307–08). On May 12, 1997, the Commissioner denied plaintiff's claim on the reconsideration level. (Tr. 335–38). On June 26, 1998, after a supplemental hearing, the ALJ concluded that plaintiff was not disabled. (Tr. 231–40). The ALJ's decision stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481 (1996).

The following evidence was presented to the ALJ.

Plaintiff, Regina Koenig, is 46 years old. She has a high school education and past relevant work experience as a waitress, dishwasher, house cleaner and counter attendant. (Tr. 383, 392). She alleges that she has been disabled since April 4, 1991. Plaintiff has not engaged in substantial

gainful activity since April 4, 1991, the alleged onset date of her disability.

In October 1986, plaintiff sought treatment from Dr. Jerry S. Jackson, a podiatrist. Dr. Jackson noted multiple deformities of both feet, worse on the left. He diagnosed enlargement of metatarsals 1, 3 and 5; hallux abducto valgus deformity; and contracture of digits 2, 3, and 4 on the left foot. (Tr. 150). On November 7, 1986, Dr. Jackson operated on plaintiff's left foot, performing a bunionectomy on the first metatarsal phalangeal joint, v-osteotomy on the third metatarsal, arthroplasty on the fifth metatarsal, and subcutaneous flexor tenotomies on digits 2, 3, and 4. (Tr. 150–51). Plaintiff did well postoperatively and made good progress. (Tr. 154).

Office notes from September 1987, show that plaintiff returned to Dr. Jackson complaining of pain in her right foot. (Tr. 154). Dr. Jackson advised plaintiff to restrict her activity and wear appropriate shoes. He also noted that the left foot was "doing fine." (Tr. 154). In May 1991, plaintiff returned to Dr. Jackson with complaints of chronic foot problems. Dr. Jackson debrided the feet and prescribed a topical medication. (Tr. 154). He advised plaintiff of the need for periodic professional debridement or medication. (Tr. 154).

On August 12, 1992, plaintiff complained of left foot pain to Dr. William B. McCollum, her treating physician. (Tr. 88). She described intermittent swelling of her left foot which had become progressively worse with shooting pain in the past month. (Tr. 88). Office notes indicate that Dr. McCollum thought plaintiff might have a nerve impingement as well as some osteoarthritic changes. He had no "big suggestions" but recommended heat and elevation and prescribed Darvocet. (Tr. 88). Plaintiff returned to Dr. McCollum on August 26 and September 2, complaining of left foot pain and limp, as well as back pain. Dr. McCollum referred her to Dr. Gary D. Boston, an orthopedist. (Tr. 88). Dr. Boston examined plaintiff on September 11, 1992. He diagnosed plantar keratoma and bunion of the left foot and recommended activity as tolerated. (Tr. 90–91).

On February 22, 1993, plaintiff visited Dr. Gael R. Frank for evaluation of residuals of left foot surgery. (Tr. 97–98). Plaintiff indicated that she was developing pain in her right foot and that occasionally the pain in her left foot radiated up to her back. Dr. Frank noted that plaintiff ambulated with an antalgic gait on the left and had some weakness of the plantar flexors of the left foot and ankle when attempting to walk on her toes. (Tr. 97). A neurological examination revealed that plaintiff had no sensory deficit though she claimed that her left foot occasionally went numb. (Tr. 97). Examination of the back showed no thoracolumbar deformity. Dr. Frank also noted that plaintiff had normal range of motion of the left foot and ankle. (Tr. 98). The diagnosis was status post-op multiple foot surgeries, exact procedures unknown; plantar callus, left foot; and possible plantar wart over third metatarsal head. (Tr. 98). Regarding plaintiff's ability to do work, Dr. Frank concluded that plaintiff could sit one hour at a time and seven hours daily; stand one hour at a time and five hours daily; walk six blocks; and lift/carry 20 pounds. (Tr. 98).

In February 1994, plaintiff received treatment at St. Luke's Hospital. (Tr. 123). She complained of pain in her feet and right hip as well as insomnia. Her doctor diagnosed probable fibromyalgia [1] and prescribed Elavil. (Tr. 123). In March 1994, a doctor noted that plaintiff's feet continued to be tender to touch, but less so than before. (Tr. 120). The doctor assessed "fibromyalgia with excellent response to Amitriptyline." (Tr. 120).

---

1. Fibromyalgia is pain in the fibrous tissues, muscles, tendons, ligaments, and other white connective tissues, frequently affecting the low back, neck, shoulders, and thighs. *See* The Merck Manual (16th ed.1992) at 1369–70.

On May 6, 1994, plaintiff returned to St. Luke's. She continued to describe burning in her feet with pain shooting up both legs and localizing in the small of her back. (Tr. 119). She reported that she could not walk without lower extremity pain and was having sleepless nights. (Tr. 119). Examination revealed that deep tendon reflexes in the right leg were slightly less than in her left and that she had point tenderness in her sacroiliac joints. A doctor noted that she was no longer getting significant pain relief on Elavil, therefore Tylenol # 3 was prescribed. (Tr. 119). X-rays of the lumbosacral spine on May 9 showed "slight degenerative change with narrowing of the L5–S1 disc interspace, with less at L4–5." (Tr. 140). The sacroiliac joints showed no fracture or erosion and were relatively symmetrical. (Tr. 140).

In June 1994, a doctor referred plaintiff to the Rheumatology Clinic at St. Luke's Hospital. (Tr. 159). She described a constant dull pain in her legs, as well as a sharp pain that traveled from her feet to her shoulders. (Tr. 159). Physical examination revealed that she was tender to palpitation all over her body, although she appeared to experience increased pain at trigger points and on the soles of her feet. (Tr. 159). The attending physician diagnosed probable fibromyalgia and prescribed Flexeril because Elavil was not working. (Tr. 159). The physician also advised plaintiff to participate in water aerobics and to decrease her sedentary activity. (Tr. 159). A subsequent staff note reported that plaintiff's symptoms were exacerbated by social considerations such as applying for disability, and that her social situation made it less likely that she would respond to treatment. (Tr. 158). On August 8, 1994, plaintiff underwent a CT scan of the lumbar spine in response to her complaint of right hip and leg pain. (Tr. 169). The scan revealed no evidence of a disk herniation or significant spinal stenosis. The physician concluded that plaintiff had "no clear anatomic correlate with the reported pain." (Tr. 169).

During her administrative hearing on October 27, 1994, plaintiff testified that she experienced sharp and constant pain in her back, hips, knees, calves, ankles and feet. (Tr. 188–89). Plaintiff stated she was currently taking Flexeril and Tylenol # 3. (Tr. 184). She said that her doctors had advised her to do water aerobics and as much walking as she could tolerate. (Tr. 190–91). Plaintiff testified that she had good days and bad days. (Tr. 185). She stated that on a bad day she would stay in bed with a heating pad and only get up to use the bathroom. (Tr. 203). Plaintiff testified that three out of four weeks in the month were usually bad days. (Tr. 185). Plaintiff stated that she could sleep only about 1–2 hours every night because of the pain. (Tr. 206). She said that she dozes off and on during the day, and her ability to function is impaired by lack of sleep. (Tr. 206). When asked if she had mental or emotional problems, plaintiff said that she was not sure, but stated that she sometimes felt depressed. (Tr. 197).

Regarding functional capacity, plaintiff testified that she could climb stairs and kneel with difficulty, walk no more than six to eight blocks, lift approximately eight pounds, bend on good days, stand for no more than 30–40 minutes, and sit for no more than ten to fifteen minutes. (Tr. 191–93).

In describing her daily activities, plaintiff testified that she does the cooking, some laundry, and other light housekeeping chores. (Tr. 193–94). Plaintiff also stated that she visits friends, visits and cooks out in her backyard, occasionally goes shopping, and watches her daughter bowl. (Tr. 195–96, 199). Plaintiff testified that after going with a friend on a "big outing" (which typically lasts from two to two and a half hours) she would be totally exhausted. (Tr. 207). She stated that she seldom drives a car. (Tr. 186). Plaintiff testified that she does simple stretching exercises at home everyday. (190–91). She also testified that she did water aerobics at a friend's pool every day from May to September of 1994. (Tr. 205–06).

The Commissioner retained Lynn I. DeMarco, M.D., a specialist in internal medicine and allergy, immunology and rheumatology, to testify as a medical expert. (Tr. 208–24). Dr. DeMarco reviewed the evidence and heard plaintiff's testimony. He testified that plaintiff had fibromyalgia, a soft tissue rheumatic disorder which causes complaints of musculoskeletal aches and pains and fatigue. (Tr. 209, 216). He stated that plaintiff also had had left foot bunion surgery with related intermittent problems since then. (Tr. 211).

Dr. DeMarco testified that traditional treatment for a person with fibromyalgia consisted of an increase in physical activity and participation in a strenuous exercise program. (Tr. 212). He stated that the more a person becomes conditioned, the less pain he or she has. (Tr. 214). Dr. DeMarco said that sedentary behavior and lying down only serve to aggravate the disorder. (Tr. 212). He also testified that fibromyalgia pain is not incapacitating pain. (Tr. 216).

Dr. DeMarco stated that plaintiff's complaints of sleeplessness were not symptoms of fibromyalgia. (Tr. 216, 219). He noted that fibromyalgia resulted in nonrestorative sleep rather than total sleep deprivation. (Tr. 218–19). He testified that such nonrestorative sleep could be successfully treated by Amitriptyline and noted that the medical record showed that plaintiff had been on such medication in the past with success. (Tr. 222). He concluded that plaintiff's sleeplessness was probably related to the fact that she was laying down too much during the day and not to fibromyalgia. (Tr. 220).

Finally, Dr. DeMarco testified that plaintiff should have no restriction with her ability to sit, walk, bend, and grip; should be able to stand for one to two hours at a time, and six to eight hours in an eight hour period; and should be able to lift 20 pounds frequently. (Tr. 213–14).

On February 22, 1996, plaintiff visited Kathleen R. McBratney, M.D., complaining of fibromyalgia and pain "in every square inch of her body." (Tr. 293).

Plaintiff reported difficulty with a number of medications and stated that she currently was not taking any medication or using her cane. Plaintiff told Dr. McBratney that she was not exercising and rarely left her house. She complained of trouble sleeping. Dr. McBratney assessed a history of fibromyalgia and possible depression. She referred plaintiff to a mental health center and suggested that plaintiff enroll in an aquatics therapy class. (Tr. 293). When plaintiff saw Dr. McBratney on June 27, 1996, she complained of dizziness and was diagnosed with orthostatic hypotension, depression, dizziness, and fibromyalgia. (Tr. 293). On August 31, 1996, plaintiff reported to Dr. McBratney with complaints that she was uncomfortable and fatigued and felt like she was "on fire inside." (Tr. 293). Her lower back hurt. Plaintiff reported that she did not start her aquatics program as she felt tired and achy all the time. Dr. McBratney diagnosed fibromyalgia and lumbosacral strain. She prescribed Flexeril and Relafen medications and encouraged plaintiff to be more active. (Tr. 293).

In a letter to plaintiff's attorney dated October 18, 1996, Rhonda Weimer, LSCSW, described her treatment of plaintiff's depression. (Tr. 296–97). Plaintiff consistently complained of sleep and appetite disturbance, interpersonal conflict, memory and concentration problems, and feeling hopeless and irritable. Ms. Weimer treated plaintiff on four separate occasions. She was under counseling for approximately three months in 1986 for help with her divorce, for two months in 1988 for divorce and other family issues, and for about a week in 1994 concerning depression secondary to her medical condition, and she had been in treatment since March 1996 for depression. (Tr. 296). Ms. Weimer stated that plaintiff met the criteria for major depression, with symptoms such as impaired concentration, impaired memory, and negative ideation. (Tr. 296). Plaintiff told Ms. Weimer that she attempted to improve her physical condition by working with physicians, taking

medications, quitting smoking, trying to exercise, studying Tai Chi, socializing, and brainstorming on jobs she could perform. Ms. Weimer noted that the focus of plaintiff's current treatment was coping with her medical limitations and either accepting disability or learning a new career skill. (Tr. 297). Ms. Weimer sent a copy of this letter to the SSA on February 20, 1997. Ms. Weimer emphasized that she thought plaintiff's depression was secondary to her medical condition. She described other aspects of plaintiff's treatment, such as computer programming classes for vocational retraining and the fact that her sessions with plaintiff were held in plaintiff's home due to her pain. Finally, she noted that plaintiff's depression would likely be resolved when plaintiff either was retrained for a job she was able to perform, or when she accepted the fact that she was disabled and unable to return to work. (Tr. 355–56)

During a visit with Dr. McBratney in November 1996, plaintiff complained of "excruciating" pain with "even the mildest of touch." Plaintiff walked with a limp. Dr. McBratney diagnosed plaintiff with a history of fibromyalgia and possible depression, suggested she start aquatic therapy, and referred her for mental health counseling. (Tr. 294).

At an administrative hearing on November 12, 1996, plaintiff testified that she was unable to work because she cannot sit or stand very long, is depressed, and experiences constant pain in her joints, i.e. knees, elbows, ankles, wrists, lower back and right hip. (Tr. 395). She testified that the pain interferes with her sleep and that she is able to sleep only short periods before the pain wakes her up. (Tr. 399, 402). As a result, plaintiff testified that she must lie down usually two or three times during the day for 30 minutes to one hour. (Tr. 414–15). She testified that she had fallen asleep in the bath tub and while watching television. (Tr. 424–25).

Plaintiff testified that she experiences crying spells, feelings of guilt and worthlessness, memory problems and appetite disturbances. (Tr. 411–13, 421–22). She testified that she visited Ms. Weimer at Northeast Mental Health every other week for counseling. (Tr. 397, 419). Ms. Weimer went to plaintiff's apartment for the counseling sessions because plaintiff had trouble getting a ride and being around people. (Tr. 419).

Plaintiff testified that she does the grocery shopping and some cleaning. (Tr. 405–06). Plaintiff testified that her youngest daughter normally does the cooking and some cleaning. (Tr. 405).

On March 17, 1997, at the request of Disability Determination Services ("DDS"), David Mouille, Ph.D., conducted a psychological evaluation of plaintiff. (Tr. 362–66). She complained of intense pain as a result of fibromyalgia, a bad back and chronic fatigue. She also reported depressive symptoms such as sadness and loss of interest in life, reduced sleep, reduced appetite, irritability, agitation, fatigue and social withdrawal. (Tr. 363). She had good concentration, and her memory functions were "far above the average range." Plaintiff's intellectual abilities were measured as in the average range. (Tr. 364). She reported a "rather simple but full day of activities," including attending to her daughter, watching the news, exercising, caring for her hygiene, maintaining her own schedule, bathing herself, preparing meals, shopping, paying bills, doing chores, caring for a sick person, and using transportation. She avoided driving and yard work because of pain. Dr. Mouille diagnosed depression (not otherwise specified), fibromyalgia and chronic fatigue. (Tr. 365). Dr. Mouille thought that plaintiff's ability to maintain adequate relationships "may be somewhat reduced" by her psychopathology, but was not "impaired." From a psychopathological standpoint, plaintiff could understand and perform simple tasks in a timely manner, she could sustain concentration over an eight hour day for simple, unskilled, routine, repetitive activity, and she could maintain an

adequate work schedule with reasonable performance demands. (Tr. 366)

On March 21, 1997, George Varghese, M.D., conducted a disability evaluation of plaintiff at the request of DDS. (Tr. 359–61). She complained to Dr. Varghese of pain in her shoulders, low back, and hips, headaches, trouble grasping with her hands, and poor sleep patterns. (Tr. 359). Her gait was slow but appeared normal with use of a cane. (Tr. 360). Although plaintiff's fine motor function was perhaps slightly decreased in her right hand, she was able to perform fine motor tasks with both hands. (Tr. 360). X-rays of plaintiff's lumbar spine and pelvis showed disc space narrowing and anterior osteophytes in two places, but no other abnormalities. She was diagnosed with diffuse muscular pain, consistent with fibromyalgia, and degenerative joint disease of the lumbar spine. Dr. Varghese opined that plaintiff was precluded from performing prolonged walking, lifting or carrying of heavy objects while walking. She could not sit or stand for prolonged periods without breaks. She could perform tasks requiring upper extremity and manual skills. (Tr. 361).

Plaintiff visited Dr. McBratney on May 30, 1997, again complaining of pain due to her fibromyalgia. She reported crying spells, insomnia and severe anxiety. She was diagnosed with fibromyalgia and depression. (Tr. 375). On follow-up for her new medication on June 27, 1997, plaintiff reported a "significant decrease" in burning in her extremities, though her pain was not "completely resolved." She was sleeping only slightly better, and her depression was "possibly better." (Tr. 374). Hypercholesterolemia was added to her diagnosis. (Tr. 375). Plaintiff continued to be treated by Dr. McBratney into early 1998. (Tr. 374).

On February 3, 1998, Stanley Mintz, Ph.D., conducted another psychological evaluation of plaintiff. (Tr. 378–80). She reported fibromyalgia, whole body pain and a variety of other medical symptoms. Plaintiff appeared depressed and irritable. She noted difficulty with memory and concentration, sleep disturbance, feelings of hopelessness and irritability, anger, tearfulness and resentfulness. Plaintiff focused on somatic complaints. She was depressed, but she retained positive internalized work attitudes. She exhibited "an excellent pattern of overall ability and skill," and was capable of retraining in a wide range of activities. Dr. Mintz diagnosed moderate dysthymia. (Tr. 379). He also believed plaintiff had "significant depression" stemming from chronic life traumas, such as her impairments. (Tr. 380). Dr. Mintz noted that he doubted whether plaintiff was capable of full-time work at the time, but noted that she was capable of being retrained.

At an administrative hearing on May 28, 1998, plaintiff testified that she had to use a cane or furniture for support. (Tr. 435). Plaintiff's hands hurt and swelled, and she had trouble with grip. (Tr. 435). Plaintiff testified that her worst problem was constant pain "all through her body" which she described as "ricocheting," and increasing with cold, damp weather. (Tr. 438, 440). Plaintiff complained she had chest tightness approximately once a month. (Tr. 441–42). Plaintiff also complained of depression, which caused her to lose sleep. (Tr. 443–44). She stated that she got one to two hours of sleep a day, because pain woke her up. (Tr. 444, 447). She testified that she spent six to ten hours trying to sleep each day. (Tr. 444).

Plaintiff testified to her daily activities. She stated that she rode her stationary bike "for a minute or two" on a daily basis to treat her pain. (Tr. 439). She did not do housework or drive, but she did go to the store with her daughters. (Tr. 450, 452).

Gary C. Homer, Ph.D., testified as a medical expert. (Tr. 454). He testified that the written record supported a diagnosis of an affective disorder, particularly a depressive disorder. (Tr. 455). He also opined that plaintiff demonstrated no problems with activities of daily living ex-

cept working in the yard and driving, which were limited by pain. (Tr. 457). He testified that plaintiff would be able to perform relatively simple work related activities, though her appearance of being blue or sad might tend to alienate others in social relationships. (Tr. 460). After considering Dr. Mintz's psychological report, Dr. Homer stated that plaintiff would be slightly restricted in activities of daily living, would have moderate difficulty in maintaining social function, and would often suffer lapses of concentration, persistence and pace. (Tr. 462).

Lisa Keen, a vocational expert, testified at plaintiff's hearing. (Tr. 464). Ms. Keen testified that based on plaintiff's description of her impairments, she would be unable to perform her past work. (Tr. 465). The ALJ then asked Ms. Keen to assume an individual with plaintiff's age and work history, an individual with physical problems including diffuse muscular pain and low back pain caused by fibromyalgia and degenerative lumbar spine disease, that she would nevertheless be able to use her upper extremities for manual tasks, that she could not lift or carry more than ten pounds, infrequently, and no more than two pounds frequently; and that she needed a sit/stand option. (Tr. 466–67). Ms. Keen testified that such a person could not perform plaintiff's past relevant work, but that she could perform sedentary, unskilled work such as cashier (with 1,400 jobs in Kansas and 159,700 jobs in the national economy), ticket seller / taker (with 700 jobs in Kansas and 76,000 jobs in the national economy), surveillance systems monitor (with 1,500 jobs in Kansas and 290,000 jobs in the nation), and information clerk (with 300 jobs in Kansas and 30,500 jobs in the nation). (Tr. 467). Ms. Keen also testified that plaintiff would be unable to maintain a job if pain, fatigue or depression affected her concentration and ability to follow instructions, if she were unable to maintain steady job attendance, or if she would have to lie down during the day because of fatigue or sleepiness. (Tr. 467–69). Finally, Ms. Keen testified that if plaintiff's concentration was not signifi-cantly impaired for relatively simple jobs, plaintiff could perform the jobs mentioned. (Tr. 470).

In his order of June 26, 1998, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since April 4, 1991.

2. The medical evidence establishes that claimant has the following severe impairments: fibromyalgia, diffuse breathing pain, lumbar spine arthritis, a sleep disorder and dysthymia. Nevertheless, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 CFR Ch. Part 404, Appendix 1, Subpart P.

3. The claimant's testimony is not found credible when considered in light of the medical signs and findings, history of medical treatment, reports of treating and examining physicians and the inconsistencies in the claimant's testimony, all of which is discussed more fully in the rationale section of this decision.

4. The claimant has a residual functional capacity to perform work-related activities except for lifting or carrying more than 10 pounds maximum occasionally and 5 pounds frequently; and requiring a sit/stand option in competitive employment (20 C.F.R. § 416.945).

5. The claimant is unable to perform her past relevant work.

6. The claimant is a younger individual (20 C.F.R. § 416.963), and has a high school education (20 C.F.R. § 416.964).

7. The claimant has no skills which are transferable to skilled or semiskilled work functions of work within her residual functional capacity (20 C.F.R. § 416.968).

8. After considering the medical expert's testimony and vocational expert's testimony in conjunction with

the claimant's above described residual functional capacity and claimant's age, education, past relevant work and nonexertional impairments, I am persuaded claimant would be able to make a vocational adjustment to work which exists in significant numbers in the local and national economies.

9. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, since the onset date of disability of April 4, 1991, and through the date of this decision. (20 C.F.R. § 416.920(f)).

(Tr. 239–40).

### Standard Of Review

The ALJ's decision is binding on the Court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler,* 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler,* 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983)).

### Analysis

Plaintiff bears the burden of proving disability under the SSA. *See Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. *See* 42 U.S.C.A. § 423(d)(1)(A) (1996). To determine whether a claimant is under a disabil-

ity, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1996).

Here, the ALJ denied benefits at step five. At step five, the fact finder must determine whether the claimant has the residual capacity to perform other work in the national economy in view of her age, education, and work experience. *See Bowen v. Yuckert,* 482 U.S. 137, 148, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). The Commissioner bears the burden of proof at step five. *See id.* at 146 n. 5, 107 S.Ct. 2287. To meet this burden, the Commissioner must show that a claimant can perform work "in the claimant's residual functional capacity category." *Talbot,* 814 F.2d at 1462. Here, the ALJ decided that plaintiff could perform numerous jobs which existed in significant numbers, e.g., information clerk, ticket seller / taker, surveillance system monitor and cashier. (Tr. 238).

The Tenth Circuit has set forth the proper framework for analyzing evidence of disabling pain. The relevant factors are (1) whether claimant proves with objective medical evidence an impairment that causes pain; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) whether the pain is disabling based upon all objective and subjective evidence. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987). In the final step, the ALJ should consider the following factors:

the levels of medication and their effectiveness, the extensiveness of the at-

tempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony with objective medical evidence.

*Huston,* 838 F.2d at 1132.

■ Plaintiff first argues that the ALJ failed to make proper credibility findings regarding her limitations caused by a sleep disorder and a mental impairment.[2] Although the ALJ recognized each as a severe impairment, he found that plaintiff had the residual functional capacity to perform a number of jobs. The ALJ's conclusion is supported by substantial evidence. After noting plaintiff's complaints including depression and a sleep disorder which caused fatigue during the day, the ALJ stated that he rejected her testimony as not fully supported by the evidence of record and that she had exaggerated her symptoms. (Tr. 237). The ALJ noted that plaintiff did not present any affidavits or testimony from third parties regarding "the duration, frequency and intensity" of her subjective complaints. (Tr. 237). Plaintiff also did not allege any adverse side effects from medications. (Tr. 237). Moreover, the ALJ attached a Psychiatric Review Technique Form where he noted that plaintiff had an affective disorder which was characterized, in part, by a sleep disturbance. (Tr. 241). The ALJ noted, however, that this impairment only slightly restricted plaintiff's activities of daily living and that plaintiff seldom had difficulties of concentration, persistence or pace resulting in failure to complete relatively simple tasks in a timely manner. (Tr. 237, 242–43). None of plaintiff's physicians recommended that she lie down during the day. Indeed, Dr. DeMarco tes-

tified at a prior hearing that plaintiff should not lie down during the day and that sedentary behavior would only aggravate her fibromyalgia. (Tr. 212–14). Finally, one doctor noted that plaintiff's fibromyalgia symptoms were exacerbated by "social considerations (applying for disability)" and that "her social situation also makes it much less likely that she will respond" to suggested aerobic activity. (Tr. 158). From this evidence, the ALJ could properly conclude that plaintiff chose to lie down of her own volition rather than due to a medical necessity. *See Brunston v. Shalala,* 945 F.Supp. 198, 202 (W.D.Mo. 1996); *Schroder v. Sullivan,* 796 F.Supp. 1265, 1270 (W.D.Mo.1992).

In addition, with respect to plaintiff's mental impairment, the ALJ stated that plaintiff's "dysthymia is of minimal severity and would not preclude simple undemanding work." (Tr. 237). The ALJ's conclusion is supported by the testimony of the medical expert who stated that plaintiff's depression may interfere with some job related tasks if the jobs involved complicated or detailed requirements, but it tends not to interfere with work activities for repetitive or simple tasks. (Tr. 460). The ALJ specifically noted the medical expert's conclusion in his decision. (Tr. 237). Moreover, Dr. Mouille stated that plaintiff had "far above average" memory and average intelligence. (Tr. 364–65). Dr. Mouille stated that from a psychopathological standpoint, plaintiff could understand and perform simple tasks in a timely manner, she could sustain concentration over an eight hour day for simple, unskilled, routine, repetitive activity, and she could maintain an adequate work schedule with reasonable performance demands. (Tr. 366). Substantial evidence supports the ALJ's credibility determination regarding plaintiff's mental impairment.

---

**2.** Plaintiff does not specifically challenge the ALJ's finding that she is not disabled because of her fibromyalgia. The Court addressed this issue in its prior order and held that the prior ALJ's decision in this regard was sup-

ported by substantial evidence. *See Koenig v. Chater,* 936 F.Supp. 776, 783–84 (D.Kan. 1996). Plaintiff's sleep disorder and mental impairment (depression) have been further evaluated since the Court's previous order.

██ Plaintiff points out that she reported to Ms. Weimer that she made numerous attempts to obtain relief from her pain. Plaintiff's attempts at relief are one factor for the ALJ to consider in evaluating plaintiff's subjective complaints of pain. *See Huston,* 838 F.2d at 1132. The ALJ may disregard these attempts as insufficient, however, or unsupported by other evidence. The ALJ essentially rejected plaintiff's attempts and concluded that plaintiff's allegations of severe restrictions and disability were not credible based upon all of the objective and subjective evidence. In reviewing the ALJ's credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Secretary of HHS,* 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." *Hamilton v. Secretary of HHS,* 961 F.2d 1495, 1499 (10th Cir.1992). Here, the Court finds that the ALJ conclusions regarding the credibility of plaintiff and the various physicians, with respect to plaintiff's limitations caused by her sleep disorder and mental impairment, are supported by substantial evidence. Although the ALJ could have discussed the evidence in greater detail, the record need only demonstrate that he considered all of the evidence; "an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir.1996) (citing *Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir.1984)).

Finally, plaintiff contends that the ALJ failed to consider the combined effects of her impairments on her ability to work. As noted above, the ALJ rejected plaintiff's claim that her sleep disorder or mental impairment interfered with her ability to perform simple undemanding work. Accordingly, the ALJ was not required to include them in his hypothetical question to the vocational expert. *See Davis v. Apfel,* 40 F.Supp.2d 1261, 1269 (D.Kan. 1999). In his hypothetical question, the ALJ included plaintiff's physical problems including diffuse muscular pain and low back pain caused by fibromyalgia and de-generative lumbar spine disease, and the restrictions that she could not lift or carry more than ten pounds infrequently, and no more than two pounds frequently; and that she needed a sit/stand option. (Tr. 466–67). The ALJ's hypothetical question tracked his conclusions regarding the severity of plaintiff's impairments of fibromyalgia, diffuse breathing pain, lumbar spine arthritis, a sleep disorder and dysthymia. (Tr. 238). Moreover, after plaintiff's attorney and the ALJ questioned the vocational expert further, the vocational expert testified that if plaintiff's concentration was impaired for complex jobs (either by a physical or mental impairment), but not for relatively simple jobs, then she would still be able to perform the jobs identified. (Tr. 469–70). Finally, after the ALJ listed all of plaintiff's severe impairments in his decision, he stated the specific restrictions the impairments imposed on plaintiff's ability to work. (Tr. 238). Thus the ALJ considered the combined effects of plaintiff's physical and mental impairments both in the hypothetical questions to the vocational expert and in his decision. *See Hamilton v. Secretary of HHS,* 961 F.2d 1495, 1500 (10th Cir.1992) (ALJ considered combined effects of impairments; ALJ need not precisely enunciate each decisional step).

**IT IS THEREFORE ORDERED** that plaintiff's *Motion for Judgment* (Doc. # 10) filed April 1, 1999, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that the Commissioner's decision to deny plaintiff social security benefits is **AFFIRMED.**